**CERTUSVIEW TECHNOLOGIES, LLC, Plaintiff/Counter-Defendant,**

**v.**

**S&N LOCATING SERVICES, LLC and S&N Communications, Inc., Defendants/Counter-Plaintiffs.**

**Case No.: 2:13cv346**

United States District Court, E.D. Virginia, **Norfolk Division.**

Signed August 02, 2016

Aaron William Moore, Matthew Burt Lowrie, Ruben Jose Rodrigues, Foley and Lardner, Boston, MA, Pro Hac, Vice, Angela L. Campbell, James Patrick Brogan, Orion Armon, Wayne Odis Stacy, Cooley LLP, Broomfield, CO, Pro Hac, Vice, Christopher Charles Campbell, Cooley LLP, Reston, VA, Gregory N. Stillman, Wendy Cohen McGraw, Hunton & Williams Norfolk, VA, Lori Allison Rubin, Michael J. Lockerby, Foley & Lardner LLP, Washington, DC, Thomas Joseph Friel, Jr., Cooley LLP, San Francisco, CA, Pro Hac, Vice, for Plaintiff/Counter-Defendant.

Brian L. Whisler, Matthew Steven Dushek, Baker & McKenzie LLP, Washington, DC, Erin Marie Choi, Benjamin Beckage Kelly, John Giuseppe Flaim, MacKenzie Marie Dewerff, Weldon Barton Rankin, Baker & McKenzie LLP, Dallas, TX, Pro Hac, Vice, Daniel Joseph O'Connor, Michael Anthony Duffy, Baker & McKenzie LLP, Chicago, IL, Pro Hac, Vice, for Defendants/Counter-Plaintiffs.

## OPINION AND ORDER

Mark S. Davis, UNITED STATES DISTRICT JUDGE

CertusView Technologies, LLC ("CertusView" or "Plaintiff/Counter-Defendant") filed this patent infringement action alleging that S&N Locating Services, LLC and S&N Communications, Inc.'s ("S&N" or "Defendants/Counter-Plaintiffs") infringed the five Patents-in-Suit. S&N responded by filing an amended answer asserting an inequitable conduct declaratory judgment counterclaim. Although the Court granted S&N's Motion for Judgment on the Pleadings and found that each of the asserted claims of the Patents-in-Suit were invalid because they did not claim patent-eligible subject matter, S&N's inequitable conduct declaratory judgment counterclaim remained for trial.[1] After a five-day bench trial, and with the benefit of post-trial briefs and proposed findings of fact and conclusions of law, S&N's inequitable conduct declaratory judgment counterclaim is ripe for decision.

Before ruling on the inequitable conduct declaratory-judgment counterclaim, the Court must address the following four motions filed by CertusView in association with the counterclaim: (1) CertusView's Rule 52(c) trial motion; (2) CertusView's remaining Motion in Limine, ECF No. 436; (3) CertusView's Motion to Enforce the Court's March 7, 2016 Memorandum Order, ECF No. 494; and (4) CertusView's Objections to Materials Cited in S&N's Post-Trial Brief, ECF No. 529.[2] After ruling on these motions, the Court will present its findings of fact and conclusions of

1. For a more detailed factual and procedural history, see May 22, 2015 Opinion and Order, ECF No. 325, and January 21, 2015 Opinion and Order, ECF No. 250.

2. CertusView also filed a Motion for Partial Reconsideration on June 15, 2016. ECF No. 533. As such Motion has limited relevance to the subjects of the instant Opinion and Order and has just recently become ripe, the Court will address such Motion separately.

law regarding S&N's inequitable conduct declaratory judgment counterclaim.

## I. CERTUSVIEW'S RULE 52(c) MOTION

Before and during trial, CertusView moved for entry of partial judgment, pursuant to Federal Rule of Civil Procedure 52(c), asserting, among other things,[3] that the Court is precluded from entering judgment in S&N's favor on its inequitable conduct counterclaim because the Court's previous ruling, that certain claims of the Patents-in-Suit are patent ineligible pursuant to 35 U.S.C. § 101, is inconsistent with a finding of inequitable conduct. See Final Pretrial Order, 41, ECF No. 472; CertusView's Post-Trial Br., 20-21, ECF No. 516; Trial Tr. Vol. 5B, 1113:15-1119:6, ECF No. 511. CertusView argues that a determination of patent eligibility is a "threshold test" that "must be satisfied before a court can proceed to consider subordinate validity issues," relying on Ultramercial, Inc. v. Hulu, LLC, 772 F.3d 709, 718 (Fed.Cir. 2014) (Mayer, J., concurring), which cites Bilski v. Kappos, 561 U.S. 593, 602, 130 S.Ct. 3218, 177 L.Ed.2d 792 (2010) and Parker v. Flook, 437 U.S. 584, 593, 98 S.Ct. 2522, 57 L.Ed.2d 451 (1978). CertusView asserts that, because the Court found the asserted claims of the Patents-in-Suit did not claim patent-eligible subject matter, such "threshold test" was not satisfied in this matter, and therefore the Court should not consider additional claims of invalidity or unenforceability. CertusView's Post-Trial Br. at 20-21. While acknowl-

edging that the patent eligibility requirements of § 101 should ideally be addressed early in a case before moving on to other requirements for patentability, S&N responds by arguing that CertusView's inequitable conduct before the United States Patent and Trademark Office ("PTO") should not be excused simply because its patents were later invalidated by this Court. S&N further argues that inequitable conduct before the PTO remains actionable after a finding of patent ineligibility because a finding of patent ineligibility and a finding of inequitable conduct are not inconsistent as such findings address substantively different legal issues. Defs.' Post-Trial Br., 28-30, ECF NO. 517.

CertusView is seeking a partial judgment pursuant to Federal Rule of Civil Procedure 52(c). Federal Rule of Civil Procedure 52(c) allows the Court to "enter judgment against [a] party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue," once that party has been fully heard on such issue. Fed. R. Civ. P. 52(c). For the following reasons, the Court finds that CertusView has not demonstrated that controlling law precludes the Court from entering judgment in S&N's favor on its inequitable conduct counterclaim.

While the parties have not cited any controlling law directly addressing the effect of a 35 U.S.C. § 101 patent ineligibility finding on an inequitable conduct counterclaim,[4] there are many decisions from

---

**3.** During trial, CertusView also argued that S&N had failed to demonstrate that CertusView engaged in inequitable conduct on any of the five grounds S&N had asserted for a finding of inequitable conduct. Trial Tr. Vol. 5A, 994:24-999:20, ECF No. 502. However, as the Court's determination of CertusView's Rule 52(c) motion on these matters is coterminous with the Court's determination regarding inequitable conduct, the Court consolidates its ruling on the remaining grounds

of CertusView's Rule 52(c) motion with its findings regarding inequitable conduct below.

**4.** There is one district court case implicitly recognizing that a finding of § 101 patent ineligibility does not preclude consideration of an inequitable conduct counterclaim. In Exergen Corp. v. Kaz USA, Inc., No. 13–cv–10628, 2015 WL 8082402 (D.Mass. Dec. 7, 2015) (unpublished), the court found that certain claims were patent ineligible under

the United States Court of Appeals for the Federal Circuit addressing the effect of a 35 U.S.C. § 102 or § 103 invalidity finding on an inequitable conduct counterclaim and concluding that a finding of patent invalidity does not preclude a finding of inequitable conduct. See Am. Calcar, Inc. v. Am. Honda Motor Co., 768 F.3d 1185, 1189 (Fed.Cir.2014) (affirming the district court's finding that a patent was both invalid, pursuant to § 102 and § 103, and unenforceable due to inequitable conduct, and stating that "[t]he jury's verdict finding the patents at issue non-obvious ... does not weigh on the determination of materiality for inequitable conduct"); Paragon Podiatry Lab., Inc. v. KLM Labs., Inc., 984 F.2d 1182, 1188 (Fed.Cir.1993) (affirming finding of patent invalidity under § 102 and finding that defendant engaged in inequitable conduct with regards to the invalidated patent); Buildex Inc. v. Kason Indus., Inc., 849 F.2d 1461, 1466 (Fed.Cir.1988) (finding that a patent was invalid under § 102(b) but remanding for determination of inequitable conduct counterclaim as "conduct in the procurement of the patent is still relevant to Kason's request for attorney fees ...4"); cf. Apotex Inc. v. UCB, Inc., 763 F.3d 1354, 1361–63 (Fed.Cir.2014) (affirming district court's finding that patent applicant committed inequitable conduct, and affirming, without considering, district court's determination that certain patent claims were invalid, pursuant to 35 U.S.C. § 112). The Court will look to such cases because, as S&N argues, a finding of patent invalidity, pursuant to § 102 or § 103, is analogous to a finding of patent ineligibility, pursuant to § 101, in that a determination under each statute results in a finding that the entire patent should not have issued. Defs.' Post-Trial Br. at 29.

■■■■ As this Court previously noted in its decision denying CertusView's motion to strike S&N's inequitable conduct counterclaim, a finding of patent ineligibility under § 101 and a finding of inequitable conduct are not inherently inconsistent as they address substantively different legal issues. May 22, 2015 Op. & Order, 15-16 n.3, ECF No. 325 (discussing the differences between a finding of patent ineligibility and a finding of inequitable conduct with its "atomic bomb" remedy (quoting Therasense, Inc. v. Becton, Dickinson & Co., 649 F.3d 1276, 1288–89 (Fed.Cir.2011) (en banc))).[5] For example, a determination of patent ineligibility under § 101 addresses the question of whether the subject matter at issue in a patent is of "the kind of discover[y]" eligible for statutory patent protection. Parker, 437 U.S. at 594, 98 S.Ct. 2522; see 35 U.S.C. § 101. Alternatively, inequitable conduct is a judicial doctrine concerned with a patent applicant's deceptive conduct before the PTO. Thera-

---

§ 101, but then noted in a footnote that counterclaims for inequitable conduct and for an exceptional case finding remained pending. See also Exergen Corp v. Brooklands, Inc., No. 1:12cvl2243, ECF Doc. No. 152 (D. Mass. Feb. 4, 2016) (allowing discovery to proceed on inequitable conduct counterclaim after finding of § 101 patent ineligibility).

5. While a finding of patent ineligibility and a finding of inequitable conduct are not inherently inconsistent, there may conceivably be cases where a finding of patent ineligibility precludes consideration of an inequitable conduct counterclaim because the patent ineligi-

bility finding extends to the entire patent, see Zenith Elecs. Corp. v. PDI Commc'n Sys., Inc., 522 F.3d 1348, 1367 n. 11 (Fed.Cir. 2008), there are no related patents at issue, there are no antitrust or unfair competition issues, there are no issues involving attorneys' fees, and there are no issues involving the crime or fraud exception to the attorney-client privilege. See Therasense, 649 F.3d at 1288–89 (discussing potential remedies upon finding of inequitable conduct and how such remedies can exceed requested relief of patent invalidity). Such a scenario is not present here.

sense, 649 F.3d at 1285–86. Moreover, a finding of patent ineligibility is a claim-by-claim determination, and the Court's determination of ineligibility as to the asserted claims of the Patents-in-Suit did not render all claims of the Patents-in-Suit patent ineligible. See January 21, 2015 Op. & Order, ECF No. 250. By contract, a finding of inequitable conduct renders an entire patent, and potentially other patents in the same technology family, unenforceable. Therasense, 649 F.3d at 1288–89. Additionally, "[a] finding of inequitable conduct may also spawn antitrust and unfair competition claims," lead to an award of attorneys' fees under 35 U.S.C. § 285 because inequitable conduct often makes a case "exceptional," or a finding of inequitable conduct "may also prove the crime or fraud exception to the attorney-client privilege." Id. at 1289 (citations omitted). Finally, a finding of inequitable conduct, "[u]nlike other deficiencies . . . cannot be cured by reissue or reexamination." Id. at 1288 (citations omitted).

The Court also notes that, while Plaintiff's Rule 52(c) Motion relies on Bilski v. Kappos, 561 U.S. 593, 130 S.Ct. 3218, 177 L.Ed.2d 792 (2010), Parker v. Flook, 437 U.S. 584, 98 S.Ct. 2522, 57 L.Ed.2d 451 (1978), and Judge Mayer's concurrence in Ultramercial, Inc. v. Hulu, LLC, 772 F.3d 709 (Fed.Cir.2014), such cases do not support the proposition that a finding of patent ineligibility precludes consideration of an inequitable conduct counterclaim. Indeed, those cases do not address inequitable conduct at all; they simply stand for the rather unremarkable proposition that patent eligibility is a question that "must be addressed at the outset of litigation." Ultramercial, 772 F.3d at 717 (Mayer, J.,

concurring). Stretching that common sense proposition to mean that absence of patent eligibility precludes inequitable conduct actionability is a bridge too far. While legal precedent on this topic is sparse, because a determination of patent eligibility pursuant to § 101 is typically resolved before a defendant has the opportunity to file an answer and raise an inequitable conduct counterclaim, or learn of inequitable conduct during discovery, the Court finds itself in the rare circumstance where both issues have been raised, are not inconsistent, and should be addressed.

For the foregoing reasons, the Court concludes that, in this case, a finding of patent ineligibility and a finding of inequitable conduct are not inconsistent, and the Court therefore **DENIES** CertusView's Rule 52(c) Motion on such basis.

## II. CERTUSVIEW'S MOTION IN LIMINE

Prior to trial, CertusView filed one document containing six Motions in Limine, ECF No. 43 6, only one of which, related to CertusView's Rule 52(c) motion, remains.[6] CertusView's remaining Motion in Limine asserts that S&N is estopped from introducing evidence of materiality, the first prong of a two-part test for determining inequitable conduct, regarding CertusView's alleged misrepresentations or omissions to the PTO. CertusView asserts two arguments in support of its motion. Mots, in Limine, 23-27, ECF No. 437. First, CertusView argues that the Court's § 101 patent ineligibility ruling determined the issue of materiality in S&N's inequitable conduct claim and, thus, S&N is collaterally es-

---

**6.** The Court addressed CertusView's first, third, fourth, and fifth Motions in Limine in its March 7, 2016 Memorandum Order. ECF No. 493. Further, the Court addressed CertusView's second Motion in Limine, regarding S&N's expert Ivan Zatkovich during Zat-

kovich's testimony at trial. To the extent that any issue regarding Zatkovich's expert testimony remains, the Court addresses Zatkovich's testimony on issues of materiality below. Thus, CertusView's sixth Motion in Limine is all that remains.

topped from presenting evidence of materiality. Second, CertusView asserts that S&N is precluded from introducing evidence of materiality because it waived such argument when S&N argued in favor of a finding of patent ineligibility under § 101. For the following reasons, the Court finds that CertusView has failed to demonstrate that S&N is estopped from introducing evidence of materiality on either ground.

■■■■ Collateral estoppel "forecloses 'the relitigation of issues of fact or law that are identical to issues which have been actually determined and necessarily decided in prior litigation in which the party against whom [collateral estoppel] is asserted had a full and fair opportunity to litigate.'" Sedlack v. Braswell Servs. Grp., Inc., 134 F.3d 219, 224 (4th Cir.1998) (quoting Ramsay v. U.S. Immigration and Naturalization Serv., 14 F.3d 206, 210 (4th Cir.1994)).[7] Specifically,

> To apply collateral estoppel or issue preclusion to an issue or fact, the proponent must demonstrate that (1) the issue or fact is identical to the one previously litigated; (2) the issue or fact was actually resolved in the prior proceeding; (3) the issue or fact was critical and necessary to the judgment in the prior proceeding; (4) the judgment in the prior proceeding is final and valid; and (5) the party to be foreclosed by the prior resolution of the issue or fact had a full and fair opportunity to litigate the issue or fact in the prior proceeding.

In re Microsoft Corp. Antitrust Litig., 355 F.3d 322, 326 (4th Cir.2004) (citations omitted).

■■■■ Alternatively, litigation, or the presentation of evidence on an issue, may also be foreclosed when that issue has been waived due to a judicial admission. A judicial admission includes "'intentional and unambiguous waivers that release the opposing party from its burden to prove the facts necessary to establish the waived conclusion of law.'" Everett v. Pitt Cty. Bd. of Educ., 788 F.3d 132, 141 (4th Cir. 2015) (quoting Minter v. Wells Fargo Bank, N.A., 762 F.3d 339, 347 (4th Cir. 2014)); see Martinez v. Bally's La., Inc., 244 F.3d 474, 477 (5th Cir.2001) ("Although a judicial admission is not itself evidence, it has the effect of withdrawing a fact from contention. A statement made by counsel during the course of trial may be considered a judicial admission if it was made intentionally as a waiver, releasing the opponent from proof of fact." (citation omitted)). "A purported judicial admission is binding only if the statement is 'deliberate, clear, and unambiguous.'" Everett, 788 F.3d at 141 (quoting Minter, 762 F.3d at 347).

■■■■ Addressing first CertusView's collateral estoppel argument, the Court finds that, because S&N's inequitable conduct counterclaim is substantively different from the issues decided in the Court's § 101 ruling, CertusView has failed to demonstrate that S&N is collaterally estopped from introducing evidence of materiality as to inequitable conduct. As discussed more fully in Section I of this Opinion and Order, a finding of patent ineligibility and a finding of inequitable conduct address substantively different legal issues. As the Court's § 101 ruling addressed a separate legal issue, the issue of materiality is not "identical to the one previously litigated," and the issue of ma-

---

7. On procedural issues not unique to the Federal Circuit's exclusive jurisdiction, the Federal Circuit will apply the precedent of the regional circuit, which in this case is the Fourth Circuit. See Aspex Eyewear, Inc. v. Zenni Optical Inc., 713 F.3d 1377, 1380 (Fed. Cir.2013) (citing Dana v. E.S. Originals, Inc., 342 F.3d 1320, 1323 (Fed.Cir.2003)). Thus, the Court relies on a statement of the law, regarding collateral estoppel, from the United States Court of Appeals for the Fourth Circuit.

teriality was not "actually resolved in the prior proceeding." In re Microsoft, 355 F.3d at 326. Further, as S&N's inequitable conduct counterclaim was not at issue when the Court considered S&N's Motion for Judgment on the Pleadings based on ineligibility, S&N did not have "a full and fair opportunity to litigate the issue [of materiality] in the prior proceeding." Id. Therefore, S&N is not precluded from presenting evidence of materiality on the basis of collateral estoppel.

■ As to CertusView's second argument, the Court finds that CertusView has not demonstrated that S&N "deliberate[ly], clear[ly], and unambiguous[ly]" waived its arguments regarding materiality earlier in this litigation. CertusView has not presented the Court with any particular statement from S&N that waives, or acknowledges waiver of, its ability to present evidence of materiality on its inequitable conduct claims. Further, as discussed above, a finding of patent ineligibility and a finding of inequitable conduct are not inherently inconsistent, or actually inconsistent in this case. Thus, S&N's general arguments in favor of patent ineligibility do not evidence an "intentional and unambiguous waiver[ ]" of its ability to present evidence that CertusView provided material misrepresentations or omissions to the PTO during prosecution of the Patents-in-Suit. Everett, 788 F.3d at 141. Therefore, S&N is not precluded from presenting evidence of materiality on the basis of judicial estoppel. For these reasons, the Court DENIES CertusView's sixth and final Motion in Limine.

### III. CERTUSVIEW'S MOTION TO ENFORCE

On March 8, 2016, CertusView filed a Motion to Enforce the Court's Memorandum Order precluding the author of the reference U.S. Pub. No. 2006/0077095 (discussed in detail below) from offering expert testimony. ECF No. 494. CertusView asserts, based on the Court's March 7, 2016 Memorandum Order precluding Page Tucker ("Mr. Tucker") from offering expert testimony, that the Court should not consider certain portions of Mr. Tucker's deposition testimony that were designated by S&N because they constitute improper lay witness testimony. Specifically, CertusView argues that the Court should not consider the portions of Mr. Tucker's deposition testimony that comment on statements written in an Amendment and Reply to the PTO by CertusView's patent counsel, Joseph Teja ("Teja"). On March 8, 2016, S&N filed its Response in Opposition to CertusView's Motion to Enforce. ECF No. 496. No reply brief was filed on this issue.

The portions of Mr. Tucker's deposition testimony, as identified by CertusView, are not proper expert witness or lay witness testimony. First, the disputed portions of Mr. Tucker's deposition testimony cannot be admitted as expert testimony because, as the Court found in its March 7, 2016 Memorandum Order, Mr. Tucker has not been designated as an expert in this matter and he may not offer expert testimony. Mem. Order, 4, ECF No. 493. However, while the Court found that Mr. Tucker may not offer expert testimony, Mr. Tucker was permitted to testify as a lay witness on subjects that do not require "scientific, technical, or other specialized knowledge." Fed. R. Evid. 701.

Second, the disputed portions of Mr. Tucker's deposition testimony are not proper lay witness testimony because they cross the line from lay witness into expert witness testimony. Specifically, Mr. Tucker's testimony consists of reading portions of Teja's statements in the Amendment and Reply and commenting on the truth or accuracy of such statements. Such testimony constitutes improper lay testimony because Mr. Tucker is interpreting and

construing patent counsel's statements advocating the patentability of a specific patent in a patent prosecution submission to the PTO, and comparing such statements against his own patent. Essentially, the testimony evidences Mr. Tucker comparing an invention seeking to be patented, through the lens of a patent attorney's arguments, to Mr. Tucker's own patented invention. A lay witness may not normally construe and interpret patent claim limitations and compare such limitations against the prior art because such testimony requires specialized knowledge. See Munchkin, Inc. v. Luv N' Care, Ltd., No. 2:13cv07228, 2015 WL 774046, at *3 (C.D.Cal. Feb. 24, 2015) (citing cases in support); Gart v. Logitech, Inc., 254 F.Supp.2d 1119, 1123 (C.D.Cal.2003); cf. 523 IP LLC v. CureMD.Com, 48 F.Supp.3d 600, 635 (S.D.N.Y.2014) (recognizing there may be some circumstances where lay witness testimony is appropriate for comparison purposes). As such, certain portions of Mr. Tucker's deposition testimony, as identified by CertusView, are both improper expert witness and lay witness testimony and the Court will disregard such deposition testimony. Therefore, the Court GRANTS CertusView's Motion to Enforce the Court's Memorandum Order.

## IV. CERTUSVIEW'S OBJECTIONS TO S&N'S POST-TRIAL BRIEF

█ On May 5, 2016, CertusView filed Objections to Material Cited in Defendants' Post-Trial Brief. ECF No. 529. CertusView broadly objects to S&N's citation to the following in its Post-Trial Brief: (1) CertusView's First Interrogatory Responses, filed under seal at ECF Nos. 344-5 and 407; (2) CertusView's Opposition to S&N's Motion to Compel and Exhibit A, ECF No. 152; (3) a portion of Curtis Chambers' Deposition Transcript, filed under seal at ECF No. 203-3, attached to S&N's Memorandum in Support of its

Emergency Motion to Compel, ECF No. 200; (4) CertusView's Proposed Findings of Fact and Conclusions of Law, ECF No. 485; and (5) an undesignated portion of Gregory Block's ("Block") deposition testimony. S&N filed a response to CertusView's objections on May 12, 2016. ECF No. 531. No reply brief was filed on this issue.

First, with respect to documents previously filed on the Court's docket, the Court, pursuant to Federal Rule of Evidence 201, may take judicial notice of public court records and parties' admissions, because the facts within such documents "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201; see O'Neal v. Donahoe, 802 F.Supp.2d 709, 715 n. 7 (E.D.Va.2011) (citing Colonial Penn Ins. Co. v. Coil, 887 F.2d 1236, 1239 (4th Cir.1989); Roach v. Option One Mortg. Corp., 598 F.Supp.2d 741, 747 n. 8 (E.D.Va.2009)). As such, the Court will take judicial notice of court documents in the record and the parties' prior admissions. The Court may take such notice "at any stage of the proceeding." Fed. R. Evid. 201(d). Further, the Court notes that the previously filed court documents were discussed during trial, and testimony and argument regarding such documents is recorded in the trial transcript. See generally Trial Tr. Vol. 4A, 692:11-701:14, ECF No. 510; Trial Tr. Vol. 5B, 1078:22-1081:16, ECF No. 511. Thus, the Court may consider documents previously filed on the Court's docket in support of S&N's arguments regarding such documents.

Second, with respect to the undesignated portion of Block's deposition testimony, S&N explains that its citation to such testimony was inadvertent and is unnecessary to its argument. Thus, based upon S&N's representation that the Court need not consider such citation to the un-

designated portion of Block's deposition transcript, the Court will disregard such citation and need not address Certus-View's objection to such citation. Therefore, the Court **OVERRULES** Certus-View's Objections to Material Cited in Defendants' Post-Trial Brief.

## V. FINDINGS OF FACT [8]

### A. Factual and Procedural Background

1. Plaintiff/Counter-Defendant, Certus-View Technologies, LLC, is a Florida corporation organized under the laws of the State of Florida. CertusView, among other things, develops technology for prevention of damage to underground infrastructure. First Am. Compl. for Patent Infringement ¶ 8, ECF No. 55. CertusView is a wholly owned subsidiary of Dycom Industries, Inc.

2. Defendants/Counter-Plaintiffs, S&N Locating Services, LLC and S&N Communications, Inc., are North Carolina corporations, organized under the laws of the State of North Carolina. S&N Communications, Inc. is the parent company of S&N Locating Services, LLC. Defs.' Second Am. Answer, Affirmative Defenses, and Countercls. to Pl.'s First Am. Compl. ¶ 1.2, ECF No. 336.

3. The subject of the instant dispute arises as a counterclaim to CertusView's First Amended Complaint for Patent Infringement of five United States Patents: No. 8,340,359 ("'359 Patent"), No. 8,265,344 ("'344 Patent"), No. 8,290,204 ("'204 Patent"), No. 8,532,341 ("'341 Patent"), and No. 8,407,001 ("'001 Patent") (collectively, the "Patents-in-Suit"). ECF No. 55.

4. Steven Nielsen ("Nielsen") and Curtis Chambers ("Chambers") are named inventors on the five Patents-in-Suit. Jeffrey Farr ("Farr") is a named inventor on the '001, '204, and '341 Patents.

5. Nielsen is the Chairman, President, and Chief Executive Officer of Dycom and the President of CertusView.

6. Chambers is the Vice President and Chief Information Officer of Dycom.

7. Farr is the Director of Engineering at Dycom.

8. Joseph Teja ("Teja") represented Dycom and CertusView before the United States Patent and Trademark Office ("PTO") during the prosecution of the Patents-in-Suit.

9. CertusView filed the underlying patent infringement action against S&N on May 29, 2013, alleging that S&N infringed on the Patents-in Suit. Compl., ECF No. 1.

10. The Court issued an Opinion and Order on January 21, 2015 regarding S&N's Motion for Judgment on the Pleadings, ECF No. 197, in which the Court determined that all of the asserted claims of the Patents-in-Suit were invalid for failure to claim patentable subject matter under 35 U.S.C. § 101. The following is a list of such invalidated asserted claims: claims 1, 2, 19, and 21 of the '204 Patent; claims 1, 4, 13, and 17 of the '344 Patent; claim 1 of the '359 Patent; claims 1, 7, 16, 17, and 28 of the '341 Patent; and claim 1 of the '001 Patent. January 21, 2015 Op. & Order, ECF No. 250.

11. S&N's Second Amended Answer alleges a counterclaim against CertusView, asserting that the Patents-in-Suit are unenforceable because the inventors, Nielsen, Chambers, and Farr, and prosecution counsel, Teja, committed inequitable conduct during prosecution of the Patents-in-Suit. ECF No. 336. In particular, S&N alleges that:

A. Nielsen, Chambers, and Teja each committed inequitable conduct by failing to

---

**8.** To the extent that the following facts are not stipulated to or agreed upon by the parties, the Court finds each fact by a preponderance of the evidence.

disclose as prior art the ESRI ArcPad software during prosecution of the '344 and '204 Patents. S&N also alleges that Farr committed inequitable conduct by failing to disclose the ESRI ArcPad software during prosecution of the '204 Patent.

B. Nielsen, Chambers, and Teja each committed inequitable conduct by failing to disclose as prior art the TelDig Utility Suite and TelDig Mobile systems [9] during prosecution of the Patents-in-Suit. S&N also alleges that Farr committed inequitable conduct by failing to disclose as prior art the TelDig Utility Suite and TelDig Mobile systems during prosecution of the '204, '341, and '001 Patents.

C. Nielsen, Chambers, Farr, and Teja each committed inequitable conduct by naming Jeffrey Farr as an inventor on the '204 and '341 Patents.[10]

D. Nielsen, Chambers, and Teja each committed inequitable conduct by failing to name Gregory Block ("Block") as an inventor of the '359, '344, '204, and '341 Patents. S&N also alleges that Farr committed inequitable conduct by failing to name Block as an inventor of the '204 and '341 Patents.

E. Nielsen, Chambers, and Teja each committed inequitable conduct by making material misrepresentations to the PTO concerning the prior art references U.S. Pub. No. 2007/0219722 to Sawyer Jr. et al. ("Sawyer") in view · of U.S. Pub. No. 2006/0077095 to Tucker ("Tucker") during prosecution of the '344 Patent.

12. S&N's inequitable conduct counterclaim proceeded to trial on March 8, 2016.

### B. Patents-in-Suit

13. The '359 Patent, which was filed on September 11, 2008, and ultimately issued on December 25, 2012, is entitled, "Electronic Manifest of Underground Facility Locate Marks." '359 Patent, PX-003.

14. The '344 Patent, which was filed on February 5, 2009, and ultimately issued on September 11, 2012, is entitled, "Electronic Manifest of Underground Facility Locate Operation." '344 Patent, PX-001.

15. The '204 Patent, which was filed on February 11, 2009, and ultimately issued on October 16, 2012, is entitled, "Searchable Electronic Records of Underground Facility Locate Marking Operations." '204 Patent, PX-002.

---

**9.** CertusView asserts that the TelDig Utility Suite is the only TelDig prior art that S&N's Second Amended Answer and Counterclaim sufficiently alleged to have not been disclosed by CertusView during prosecution of the Patents-in-Suit. Thus, CertusView argues, S&N cannot claim that CertusView committed inequitable conduct by failing to disclose the TelDig Mobile system. However, the Second Amended Answer specifically discusses TelDig Mobile, ¶ 79, and lists specific claims to which "the TelDig products disclosed in the MIR[] are thus relevant," ¶ 90. Thus, while S&N's discussion of the TelDig Mobile system in its Second Amended Answer and Counterclaim is more limited than S&N's discussion of the TelDig Utility Suite, S&N adequately identified "the specific who, what, when, where, and how of the material misrepresentation or omission committed before the PTO." Exergen Corp v. Wal–Mart Stores, Inc., 575 F.3d 1312, 1328 (Fed.Cir.2009); see

also May 22, 2015 Op. & Order at 34-36. Further, the pre-trial filings in this matter provide CertusView with sufficient notice regarding S&N's assertion that CertusView failed to disclose the TelDig Mobile system as material prior art during the prosecution of the Patents-in-Suit. As such, even if S&N had not included discussion of the TelDig Mobile system in its Second Amended Answer and Counterclaim, the Court would permit amendment of S&N's pleadings regarding TelDig Mobile as doing so would aid presentation of the merits of the case and CertusView would not be prejudiced. Fed. R. Civ. P. 15(b) (1).

**10.** S&N also alleged that Nielsen, Chambers, Farr, and Teja each committed inequitable conduct by naming Jeffrey Farr as an inventor on the '001 Patent. However, this claim was dismissed with prejudice on March 3, 2016. Order, ECF No. 489.

16. The '001 Patent, which was filed on December 16, 2009, and ultimately issued on March 26, 2013, is entitled, "Systems and Methods for Using Location Data to Electronically Display Dispensing of Markers by a Marking System or Marking Tool." '001 Patent, PX-004.

17. The '341 Patent, which was filed on March 12, 2013, and ultimately issued on September 10, 2013, is entitled, "Electronically Documenting Locate Operations for Underground Utilities." '341 Patent, PX-005.

18. The '359 and '344 Patents claim priority to patent application 12/029,732, which was filed on February 12, 2008, and issued as United States Patent No. 8,532,-342 ("'342 Patent"), on September 10, 2013. The '342 Patent is entitled, "Electronic Manifest of Underground Facility Locate Marks." '342 Patent, DX-341.

19. The '341 Patent is a continuation-in-part of the '204 Patent. Both the '204 and '341 Patents claim priority to the following: (1) the '342 Patent, and (2) patent application 12/366,853, filed on February 6, 2009, issued as United States Patent No. 8,280,117 ("'117 Patent"), and entitled "Virtual White Lines for Indicating Planned Excavation Sites on Electronic Images," '117 Patent, PX-022. The '117 Patent is a continuation-in-part of patent application 12/050,555, filed on March 18, 2008, now United States Patent No. 8,249,-306 ("'306 Patent"), and entitled, "Virtual White Lines for Delimiting Planned Excavation Sites." '306 Patent, DX-354.

20. The '001 Patent claims priority to patent application 11/685,602, which was filed on March 13, 2007 and issued as United States Patent No. 7,640,105 ("'105 Patent") on December 29, 2009. See '001 Patent, PX-004. The '105 Patent is entitled "Marking System and Method with Location and/or Time Tracking."

## C. Patents-in-Suit Products

21. In general, CertusView's products were developed as a means to improve record-keeping and documentation of locate operations.

22. The '359 and '344 Patents claim inventions related to CertusView's e-Sketch technologies. Trial Tr. Vol. 1B, 99:16-22, ECF No. 507.

23. The '204 and '341 Patents claim inventions related to CertusView's Virtual WhiteLine and e-Sketch technologies. Trial Tr. Vol. 4A, 759:22-761:14, 766:5-13, ECF No. 510.

24. The '001 Patent claims inventions related to CertusView's e-Sketch and electronic marking wand technologies. Trial Tr. Vol. 2A, 241:4-7, ECF No. 505.

25. CertusView's e-Sketch technology allows locators to document a locate operation by sketching on top of an image with a sketch toolbar, drawing property lines, adding landmarks, utility lines, and tie-downs to the image, and creating a searchable electronic record that includes geographic data tied to such markings. Trial Tr. Vol. 4A at 740:12-742:1, 754:7-759:13; E-Sketch Demonstrative Video, PX-041; PowerPoint Presentation "Using Innovation to Prevent Damages," PX-059.

26. CertusView's Virtual WhiteLine product allows excavators to show on an image, with a high level of precision, where they intend to dig. Trial Tr. Vol. 4A at 739:21-740:3.

27. CertusView's electronic marking wand product uses GPS and other technology to capture and display, in real time, the precise location where paint is applied to the ground during a locate operation. Data from the marking wand, generated during a locate operation, is automatically imported into the e-Sketch program. Trial Tr. Vol. 4A at 729:20-736:15.

### D. Inventorship of the Patents-in-Suit

#### 1. Nielsen and Chambers

28. Conception of CertusView's e-Sketch product began as a result of the "Virtual Locator 2007" project, a research and development initiative undertaken in fall 2006. Trial Tr. Vol. 1B at 101:12-102:13.

29. The first meeting regarding the Virtual Locator 2007 project took place in Atlanta, Georgia in October 2006. During that meeting, Nielsen and Chambers met with the management team of UtiliQuest, a Dycom subsidiary that performs underground facility locating, to present their research and development findings. Trial Tr. Vol. 1B at 101:19-102:2, 185:7-187:19.

30. Nielsen and Chambers discussed the Virtual Locator 2007 initiative and aspects of the inventions described in the Patents-in-Suit in a white-board session. Trial Tr. Vol. 1B at 185:7-187:19.

31. Notes taken during that white-board session parallel certain claims of the Patents-in-Suit and demonstrate conception of certain inventions claimed in the Patents-in-Suit, particularly claim 1 of the '359 Patent and claim 1 of the '344 Patent. Trial Tr. Vol. 2A at 254:20-262:9; White Board Notes, PX-113.

32. Conception of the inventions claimed in the Patents-in-Suit continued after October 2006 through additional meetings regarding the Virtual Locator 2007 project and other activities, including:

A. In December 2006, the Virtual Locator 2007 research and development team, including Chambers, met with an attorney in Washington, D.C., discussing how to patent the electronic marking wand and e-Sketch inventions. Trial Tr. Vol. 1B at 101:19-102:13.

B. In December 2006, Chambers created a video of one of the Virtual Locator 2007 projects. Such video detailed a prototype of the electronic marking wand and e-Sketch concepts. Trial Tr. Vol. 1B at 193:8-195:2; Video, PX-042.

C. In April 2007, Nielsen and Chambers ran a series of experiments with a Garmin running watch. Using Google Earth, Chambers and Nielsen were able to display GPS coordinates, generated by the Garmin running watch and stored in a KML file, on a Google Earth map image. Trial Tr. Vol 1B at 195:20-197:5; Trial Tr. Vol. 2A at 202:14-205:9; Google Earth File 1, PX-034; Google Earth File 2, PX-035; Google Earth File 3, PX-036.

33. Nielsen and Chambers completed conception of the inventions claimed in the '359 and '344 Patents no later than April 2007. Trial Tr. Vol. 2A at 206:4-207:14; Trial Tr. Vol. 4B, 818:15-819:5, ECF No. 503.

34. After conception of the inventions claimed in the '359 and '344 Patents was complete, CertusView and Dycom conducted prototype and pilot programs of the electronic marking wand and e-Sketch products during the summer and early fall of 2007 in Orlando, Florida and Beltsville, Maryland. Trial Tr. Vol. 1B at 100:10-102:24.

#### 2. Farr

35. Farr became involved in CertusView's electronic wand invention at the beginning of the project. Trial Tr. Vol. 4A at 729:6-10. Farr worked with Nielsen and Chambers to conceptualize the marking wand invention and build working prototypes. Trial Tr. Vol. 3A, 472:13-23, ECF No. 504; Marking Wand Physical Ex. 1, PX-037; Marking Wand Physical Ex. 2, PX-038; Marking Wand Physical Ex. 3, PX-039.

36. Farr is an undisputed inventor on the '001 Patent, which relates to the electronic marking wand invention, as well as an inventor on the '105 Patent, the original GPS-enabled marking wand patent and

parent of the '001 Patent. See '001 Patent, PX-004.

37. Farr also led development of CertusView's Virtual WhiteLine product. Trial Tr. Vol. 2A at 242:10-20; Trial Tr. Vol. 4A at 742:16-743:12.

38. Aspects of the Virtual WhiteLine technology have been patented, including in the '117 Patent. Farr is a named inventor on the '117 Patent. '117 Patent, PX-022.

39. Eventually, Farr became involved with combining the e-Sketch and Virtual WhiteLine products. Trial Tr. Vol. 2A at 241:8-242:24; Trial Tr. Vol. 4A at 743:13-25, 760:10-18.

40. Beginning in fall 2008, Farr oversaw a team working on "Project Trinity," an effort which, among other things, included integrating CertusView's Virtual White-Line product with the e-Sketch invention. Trial Tr. Vol. 4A at 748:4-19. In particular,

A. In October 2008, the Project Trinity team completed the Project Trinity rollout plan which included the "marriage" of the Virtual WhiteLine and e-Sketch inventions. Trial Tr. Vol. 4A at 749:4-750:10; Monthly Departmental Report—Information Technology October 2008, PX-102.

B. In November 2008, the Project Trinity team implemented e-Sketch in Lawrenceville, Georgia and ticket approval in Dallas, Texas, Austin, Texas, and Lawrenceville, Georgia. Trial Tr. Vol. 4A at 750:11-751:12; Monthly Departmental Report—Information Technology November 2008, PX-103.

C. In December 2008, the Project Trinity team implemented e-Sketch and ticket approval in Marietta, Georgia. Trial Tr. Vol. 4A at 751:13-752:9; Monthly Departmental Report—Information Technology December 2008, PX-104.

D. In February 2009, the Project Trinity team implemented e-Sketch in Forest Park, Georgia and ticket approval in Forest Park, Georgia and Commerce, California. Trial Tr. Vol. 4A at 752:11-753:5; Monthly Departmental Report—Information Technology February 2009, PX-105.

41. As noted above, the '204 Patent is a continuation-in-part of the '342 and '117 Patents. '204 Patent, PX-002.

42. Farr's contribution to the '204 Patent dealt with the "at least one input image" limitation–which appears in each independent claim of the '204 Patent and is a limitation on every claim in the '204 Patent–and additional specific limitations contained in claims 6, 7, 8, 10, 12, and 14 of the '204 Patent. Trial Tr. Vol. 3B, 675:10-677:23, ECF No. 509; Trial Tr. Vol. 4A at 762:8-764:25.

43. Farr was involved in a "collaborative effort" during the inventive process of the '204 Patent, and "may have involvement collaboratively in every claim" of the '204 Patent. Trial Tr. Vol. 3B at 677:12-19; Trial Tr. Vol. 4A at 701:2-14.

44. Teja determined that Farr was an inventor of the '204 Patent based on Farr's work on the '117 Patent and his contributions to the '204 Patent.[11] Trial Tr. Vol. 3A at 470:18-471:16. CertusView relied on Teja's recommendations regarding inventorship. Trial Tr. Vol. 2A at 242:10-243:25, 264:12-265:16; Trial Tr. Vol. 3B at 627:11-628:5.

45. Farr's contribution to the '341 Patent dealt with the "at least one digital image" limitation, which appears in every claim of the '341 Patent, as well as specific contributions to claims 8, 13, and 21. Trial Tr. Vol. 4A at 692:11-20, 698:9-23, 766:19-768:13.

---

11. CertusView's process for determining inventorship is discussed below. See infra ¶¶ 60-62.

46. Teja determined that Farr was an inventor of the '341 Patent based on Farr's work on the '117 Patent, as well as Farr's contributions to the '204 Patent and the '341 Patent. Trial Tr. Vol. 3A at 471:17-473:16. CertusView relied on Teja's recommendations regarding inventorship. Trial Tr. Vol. 2A at 242:10-243:25, 264:12-265:16; Trial Tr. Vol. 3B at 627:11-628:5.

47. Farr did not receive any financial reward for being named as an inventor on the '204, '341, or '001 Patents. Trial Tr. Vol. 2A at 265:17-19.

### 3. Block

48. Block joined Dycom in September 2007 as a contract employee, working as a "developer" or "architect." Trial Tr. Vol 1B at 103:9-17. "As an application architect, [Block's] duties included accepting software specifications and developing technical specifications based on the requirements, and assessing feasible technology solutions that would implement those requirements." Block Depo. Tr. at 23:2-14.

49. While working for Dycom, Block implemented some of the inventions conceived by Chambers and Nielsen, related to e-Sketch product prototypes, by writing source code for the e-Sketch product prototypes. Trial Tr. Vol. 1B at 104:5-105:4; Trial Tr. Vol. 2A at 250:5-16; Block Depo. Tr. at 49:17-50:3.

50. Block implemented features of e-Sketch based on specifications that he received from Chambers and instructions and drawings Block received from Nielsen. Trial Tr. Vol. 2A at 250:10-253:12; Block Depo. Tr. at 107:21-109:19; Dycom Industries, Inc., System Requirements Specification for Locating eSketch, DX-041.

51. On May 5, 2008, Block signed a Confidentiality and Assignment Agreement with Dycom, before he became a full-time employee with Dycom, assigning ownership of any inventions to Dycom and confirming that he did not reserve any invention rights. Such Agreement covered Block's entire engagement with Dycom. Trial Tr. Vol 2A at 245:1-246:24; Block Depo. Tr. at 96:8-97:1; Dycom Technology, LLC—Confidentiality and Assignment Agreement, PX-044.

52. On February 26, 2009, Block signed an Employee Confidentiality and Assignment Agreement with Dycom, assigning ownership of any work product created during his employment to Dycom and confirming that he did not reserve any prior invention rights. Such Agreement covered Block's entire engagement with Dycom. Trial Tr. Vol. 2A at 247:20-249:9; Block Depo. Tr. at 97:6-15; Employee Confidentiality and Assignment Agreement, PX-045.

53. Block does not claim to have made any inventive contribution to the e-Sketch product or any of the Patents-in-Suit. Trial Tr. Vol. 2A at 24 9:12-22; Trial Tr. Vol. 3B at 628:17-19; Block Depo. Tr. at 101:22-106:15.

54. No witness testified that Block was an inventor of any claim of the Patents-in-Suit or that he should have been listed as an inventor to any of the Patents-in-Suit.

55. Block, however, was named as an inventor on other CertusView patents related to e-Sketch, including United States Patent No. 8,907,980 ("'980 Patent"), which claims inventions relating to revision layers. Trial Tr. Vol. 2A at 253:13-254:6; Block Depo. Tr. at 42:20-44:1; '980 Patent, PX-025.

56. Block was not deprived of any financial reward for not being named as an inventor on the Patents-in-Suit, nor did he receive any financial reward for being a named inventor on other CertusView patents, including later patents related to the e-Sketch products. Trial Tr. Vol. 2A at 265:20-266:1; Trial Tr. Vol. 4B at 828:17-22.

### E. Commercial Strategy

57. In April 2008, Dycom hired intellectual property consulting firm Commercial Strategy, LLC ("Commercial Strategy") to assist it with the development of its intellectual property and patent portfolio. Don Davis ("Davis") and David Crawford ("Crawford") were the managing directors and founders of Commercial Strategy. Trial Tr. Vol. 1B at 125:13-126:25; Trial Tr. Vol. 3A at 534:15-535:3; Master Services Agreement for Consulting Services, April 22, 2008, DX-074.[12]

58. On April 22, 2008, Dycom completed a Statement of Work for Commercial Strategy which directed Commercial Strategy to begin immediately implementing a work plan, including searching for prior art, conducting inventor interviews, drafting invention disclosures, supporting patent counsel, and auditing Dycom's existing intellectual property rights. Master Services Agreement for Consulting Services, April 22, 2008, DX-074.

59. Commercial Strategy, particularly Crawford, worked with CertusView and patent counsel to support CertusView's intellectual property development, including communicating with patent counsel, researching patent and non-patent prior art, hosting invention capture sessions, and conducting inventor interviews. Trial Tr. Vol. 3A at 541:10-542:6, 547:16-548:11, 551:11-553:23; Trial Tr. Vol. 3B at 558:8-14, 610:1-611:6.

60. When identifying potential inventions and inventors, Crawford would work with a technologist, who would help convey the technical description of the invention, and Commercial Strategy employee Tom Batchelder ("Batchelder"), who led the invention interviews. Trial Tr. Vol. 3B at 610:11-611:6.

61. After completing invention interviews, CertusView and Commercial Strategy, primarily Batchelder, Davis, and Crawford, would prepare an invention disclosure to submit to patent counsel for review. Trial Tr. Vol. 3B at 625:15-626:11.

62. Particularly with continuation-in-part patent applications, Teja might participate in the invention interviews, and Crawford and Teja would review the final claims in the patent application to determine proper inventorship. Trial Tr. Vol. 3B at 627:1-628:5.

63. When researching prior art, Crawford would review the results of the patent prior art searches, or the non-patent prior art that he found or received, and would provide pertinent prior art references to Teja. Trial Tr. Vol. 3B at 618:12-624:9, 652:6-657:12.

### F. Prior Art Disclosure

#### 1. Market Intelligence Report ("MIR")

64. Within the first three months of Commercial Strategy's engagement with Dycom, Commercial Strategy prepared for Dycom a document entitled "Market Intelligence Report Version 6.0" ("MIR"), dated July 22, 2008 and marked "draft" and "confidential," which surveyed players in

---

12. The Court has entered numerous Orders in this matter, ordering certain documents to be sealed. See ECF Nos. 105, 106, 126, 192, 295, 357, 359, 402, 422, 471, 477, 487, 488, 528. The parties, however, have referred to the contents of a number of these sealed documents throughout their unredacted filings, post-trial briefing, and in open court during the bench trial of this matter. Further, several such sealed documents were entered into evidence and the public record during the bench trial. Therefore, to the extent that the parties have discussed the contents of these sealed documents in their filings, briefings, and in open court, or have entered such documents into evidence, the Court considers the parties' arguments regarding the need for such information to be sealed to have been waived. See Level 3 Commc'ns, LLC v. Limelight Networks, Inc., 611 F.Supp.2d 572, 589 (E.D.Va. 2009).

the locate industry and included competitive research on the intellectual property and business strategy of such companies. Trial Tr. Vol. 3B at 558:15-559:4, 633:7-22; Market Intelligence Report Version 6.0, July 22, 2008, DX-091 [hereinafter "MIR"].

65. The MIR was never published or otherwise finalized. Trail Tr. Vol. 2A at 273:8-16; Trial Tr. Vol. 4B at 828:2-11.

66. The information in the MIR was sourced between May and June 2008, MIR at 6, and was designed to "analyze companies (industry players) of interest to Dycom," MIR at 3. The MIR identified approximately fifty "target" companies and provided profiles on a subset of companies on the target list "that [were] found of interest and therefore found to be highly relevant to Dycom objectives," MIR at 9, including:

A. Environmental Systems Research Institute, Inc. ("ESRI"), a geographic information systems ("GIS") software developer. ESRI offered a variety of GIS software products and services, including the ESRI ArcPad software product. MIR at 47-55.

B. TelDig Systems, Inc. ("TelDig"), a Canadian company that sells software products related to the location industry. TelDig products include the TelDig Utility Suite, TelDig Mobile, and TelDig One Call. MIR at 75-79.

67. With respect to ESRI, the MIR noted that "many [ESRI] applications including the ArcPad software read very closely to the eSketch concept," and "ESRI does appear to be investing in problems Dycom is interest[ed] in solving." MIR at 47. In particular, the MIR noted that the ESRI ArcPad product is an improvement to using "[p]aper map books" to locate assets in the field because the ArcPad product allows "field-based personnel to capture, analyze, and display geographic information in near real time" with "great[er] accuracy while on-site." MIR at 49. The MIR further states that ESRI's technology includes: GPS, wireless data sharing, data analysis, ticket management, utilization management, mapping and GIS, and image and audio storage. MIR at 55.

68. With respect to TelDig, the MIR noted that "[o]f particular interest is the TelDig Utility Suite product which appears similar to the eSketch concept," and also noted that "it does appear that TelDig is investing in solving problems that Dycom is interested in." MIR at 75. In particular, the MIR noted that the TelDig Utility Suite "is a system of software products for locate ticket dispatching and workforce management." MIR at 76. The MIR also noted that TelDig Mobile, in connection with the TelDig Utility Suite, "enabl[es] the paperless handling of locate requests from the one call center to the locator and back," allowing "the remote locator [to] download[ ] tickets, edit[ ] and process [ ] them" and "fill [ ] in the dig site, locator and damage report modules to upload completed tickets at the end of the day," using a "unique drag-and-drop drawing tool with pre-formatted icons." MIR at 77. The MIR further states that TelDig technology includes: wireless data sharing, ticket management, mapping and GIS, and image and audio storage. MIR at 79.

69. Crawford provided Chambers with a copy of the MIR in July 2008 and the two discussed the MIR shortly thereafter. Trial Tr. Vol. 3B at 634:8-18, 636:24-638:3.

70. Chambers did not find the MIR to be "valuable from a technical point of view." Trial Tr. Vol. 3B at 634:8-18. Specifically, regarding ESRI and TelDig, Chambers disagreed with the conclusions in the MIR because he believed such conclusions to be incorrect based upon his understanding of the ESRI and TelDig technology. Trial Tr. Vol. 2A at 212:18-218:7, 235:15-237:6; Trial Tr. Vol. 3B at 634:19-635:3

71. With respect to ESRI, Chambers relied on his personal research and experi-

ence with ESRI products to conclude that the MIR's statements regarding ESRI technology were inaccurate. Specifically, Chambers was aware of the ESRI products because, in 2007, CertusView had assessed ESRI as a possible "off-the-shelf" solution to implement the e-Sketch application. However, CertusView concluded that the ESRI product did not offer the base functionality needed for the e-Sketch prototype, requiring expensive custom development to use the ESRI product for the e-Sketch application. Trial Tr. Vol. 2A at 231:9-237:6.

72. Further, Crawford conducted additional research regarding ESRI and concluded that, based on his research and the information in the MIR, ESRI was not material to patentability. Trial Tr. Vol. 3B at 641:20-642:21; Dycom Competitive Technology Research ESRI, May 29, 2008, DX-083.

73. With respect to TelDig, Chambers relied on his previous experience with TelDig and his understanding of TelDig's products to conclude that the MIR's conclusions regarding TelDig were inaccurate. Trial Tr. Vol. 2A at 213:3-13. Specifically,

A. Chambers had been aware of TelDig because CertusView entered into a Non-Disclosure Agreement ("NDA") with TelDig, in April 2008, regarding TelDig's parser technology. Trial Tr. Vol. 2A at 213:14-214:6. Such NDA provided that Dycom was "willing to provide" TelDig with information concerning its "business of locating underground facilities" and that TelDig was "willing to provide" Dycom with "more detailed information" concerning TelDig One Call, TelDig Utility, TelDig Mobile, and TelDig Nexus products. Non-Disclosure Agreement between Dycom and TelDig, April 10, 2008, DX-071.

B. Chambers had seen a full demonstration of TelDig's software in 2007, prior to execution of the NDA between CertusView and TelDig. Trial Tr. Vol. 2A at 214:7-216:10.

C. Chambers also had conversations with individuals from TelDig, after execution of the NDA, regarding e-Sketch and Chambers did not receive any indication that TelDig had a product that functioned like e-Sketch. Trial Tr. Vol. 2A at 216:14-218:7.

74. Crawford conducted additional research regarding TelDig and concluded that, based on his research and the information in the MIR, TelDig was not material to patentability. Particularly, Crawford's additional research on TelDig included participating in a WebEx demonstration of the TelDig One Call software through a Canadian Dycom subsidiary. Trial Tr. Vol. 3B at 638:21-641:1.

75. Neither the MIR, nor the included information regarding ESRI or TelDig, was provided to Teja or CertusView's previous patent counsel. Trial Tr. Vol. 2A at 271:9-273:7, 280:18-281:3; Trial Tr. Vol 2B, 370:23-371:4, ECF No. 508.[13]

76. However, certain information in the MIR, regarding other companies and products, that CertusView concluded was relevant and material to patentability was provided to patent counsel and cited during prosecution of a number of CertusView's patent applications. For example, products related to 3M Dynatel, Metrotech, RadioDetection, Subsite, Celeritas, and Trimble, which were discussed in the MIR, were cited during prosecution of various CertusView patent applications. Trial Tr. Vol. 3A at 481:5-483:17, 517:20-518:17.

---

**13.** The MIR itself has never been provided to the PTO, and the MIR is not listed as "prior art" for any of the Patents-in-Suit. See '344 Patent, PX-001; '204 Patent, PX-002; '359 Patent, PX-003; '001 Patent, PX-004; '341 Patent, PX-005. Further, no evidence was presented at trial that Farr knew of or reviewed the MIR.

## 2. ESRI

77. ESRI is a GIS software developer, and the ESRI ArcPad software was first released in 2000 or 2001. Trial Tr. Vol. 5A, 1005:12-1006:6, ECF No. 502.

78. When it was developed, the ESRI ArcPad software was designed to allow users to employ the ESRI software, a GIS database package, on a mobile device to "join maps and databases together." Trial Tr. Vol. 5A at 1006:16-1007:9; see Trial Tr. Vol. 2A at 235:20-236:4; Dycom Competitive Technology Research ESRI, May 29, 2008, DX-083.

79. No ESRI products or specific ESRI references were introduced in evidence, nor did S&N identify a particular ESRI ArcPad product version or reference that it alleges should have been disclosed to the PTO.

80. CertusView considered partnering with ESRI in 2007 and integrating ESRI software as part of its e-Sketch product. However, as noted above, CertusView determined that such partnership was not feasible because the ESRI software would require extensive customization to work with the e-Sketch product. In particular, the ESRI software did not have the functionality, "out of the box," necessary for e-Sketch because the ESRI software did not document paint or markers on the ground while a locate operation was taking place, nor did ESRI software geo-code or timestamp when such marks were made in the ESRI database. Trial Tr. Vol. 2A at 235:20-237:6.

81. Teja had general knowledge of ESRI through his work with CertusView, but he became aware of specific prior art references regarding the ESRI software products through a PTO Office Action during prosecution of an unrelated CertusView patent application. Trial Tr. Vol. 2B at 324:24-326:17.

82. There is no evidence that Teja, Nielsen, Chambers, or Farr knew of these specific ESRI prior art references before the PTO's citation of such references during prosecution of the unrelated patent application.

83. Upon reviewing the specific ESRI prior art references, Teja determined that such references were not material to any of the Patents-in-Suit because such references were "cumulative or in many respects duplicative" of other references he had submitted to the PTO during prosecution of the Patents-in-Suit. Trial Tr. Vol. 3A at 477:25-478:23.

84. Nonetheless, out of "an abundance of caution," Teja submitted the specific ESRI prior art references to the PTO during prosecution of the '359, '341, and '001 Patents, the three Patents that were in the early stages of prosecution when Teja learned of the specific ESRI prior art references. Trial Tr. Vol. 3A at 476:15-477:16, 514:6-516:18.

85. Four references regarding ESRI products were cited during prosecution of the '001, '359, and '341 Patents: (1) ArcFM, White Paper, 2006, 1-28; (2) ArcGIS 9, Geocoding in ArcGIS, Manual, 2004, 1-192; (3) ArcPad, Mobile GIS Software for Field Mapping Applications, brochure, 2006; and (4) ArcPad: Mobile GIS, ESRI White Paper, Sept. 2004. '001 Patent, PX-004; '359 Patent, PX-003; '341 Patent, PX-005. The '341 Patent also cited ArcFM UT, "A GIS for Utilities Based on Standards," White Paper, AED SICAD, Sept. 2008, 1-28. '341 Patent, PX-005. The '001 Patent also cited ESRI Corporate Introduction, printed on Dec. 9, 2009 (original publication date unknown). '001 Patent, PX-004.

86. Teja did not submit the specific ESRI prior art references to the PTO during prosecution of the '344 and '204 Patents because the '344 Patent had issued before he learned of the specific ESRI prior art references and Teja had already

paid the issuance fee for the '204 Patent. Trial Tr. Vol. 3A at 476:15-477:16.

87. The specific ESRI references submitted by Teja to the PTO were never used as a basis for rejection of the '359,-'341, and '001 Patents or any other patent in the e-Sketch family. Trial Tr. Vol. 3A at 477:17-24.

### 3. TelDig

88. TelDig develops software products related to all aspects of infrastructure interventions. Among other things, TelDig developed ticket management systems for One Call centers and dealt with the creation and editing of "notification polygons." Trial Tr. Vol. 1B at 152:20-159:19; Trial Tr. Vol. 2A at 276:4-277:3.

89. No TelDig products were introduced in evidence, nor did S&N identify a particular TelDig Utility Suite product version or reference that it alleges should have been disclosed to the PTO. Further, S&N did not identify a particular TelDig Mobile product version that it alleges should have been disclosed to the PTO.

90. CertusView interviewed TelDig in 2007 as a potential vendor and participated in TelDig sales demonstrations. Trial Tr. Vol 2A at 214:7-216:10.

91. Dycom and TelDig entered into an NDA for the exchange of information in April 2008, including exchange of information about TelDig One Call, TelDig Utility, TelDig Mobile, and TelDig Nexus products. Trial Tr. Vol. 2A at 213:14-214:6; Non-Disclosure Agreement between Dycom and TelDig, April 10, 2008, DX-071.

92. In 2009, Davis attended the Common Ground Alliance trade show, at which he identified TelDig as a company with which CertusView might be interested in forming a technology partnership to integrate CertusView's Virtual WhiteLine and e-Sketch software with other systems, particularly TelDig's One Call product. Trial Tr. Vol. 2A at 219:1-220:9; Trade Show Summary Notes, PX-043.

93. Davis' work, integrating CertusView's Virtual WhiteLine and e-Sketch concepts with TelDig's One Call software, continued throughout 2009, culminating in a "Services and Integration Agreement" between TelDig and CertusView on November 5, 2009. Services and Integration Agreement between CertusView and TelDig, November 5, 2009, DX-134. Such integration allowed TelDig One Call users to launch CertusView's Virtual WhiteLine software from the One Call program. Further, such integration allowed for the One Call system and the Virtual WhiteLine software to work together and share information for the benefit of both entities' users. Trial Tr. Vol. 2A at 301:1-309:6.

94. During the time that CertusView and TelDig sought to integrate the Virtual WhiteLine product and the One Call software, Farr and others saw a live web demonstration of TelDig's drawing tool, which Farr believed to be associated with TelDig One Call software. Trial Tr. Vol. 4B at 799:7-23.

95. Based on CertusView's interactions with TelDig between 2007 and 2010, CertusView understood, and the evidence at trial demonstrated, that:

A. TelDig's notification system included a high-level, large-area drawing tool used by excavators to mark an image and denote the area of excavation. Such drawing tool, however, did not have the ability to input specific utilities, tie-downs, or landmarks on an image of a narrow and highly specific geographic area, or timestamp such additions to an image. Trial Tr. Vol. 2A at 221:12-227:13; Trial Tr. Vol. 4A at 774:1-777:4; Email Re: TelDig Systems—TelDig Web Drawing Tool Integration-vl 10.doc, PX-057. Integration of the TelDig One Call software and the Virtual WhiteLine product allowed One Call users to

mark up a very specific geographic area on a high-resolution aerial image for an excavator. Trial Tr. Vol. 2A at 306:22-308:8.

B. Once a drawing was completed using the TelDig drawing tool, the drawing was saved to the web server in PNG format, an image or graphics format. A file saved in PNG format does not allow a locator to include layers of information (image, mark-ups, geo-code data, and timestamps, etc.) in the same file or to search through layers of data saved within a single PNG file. Further, a PNG file is not able to record geo-coded locate marks, i.e. paint on the ground matched to specific GPS coordinates for each mark. Trial Tr. Vol. 2A at 221:12-222:10; Trial Tr. Vol. 4A at 776:7-25; Trial Tr. Vol 4B at 802:13-804:2.

C. The TelDig drawing tool, while not used in such a fashion, might be used to mark a digital image and to show the results of a locate operation. However, the TelDig drawing tool was used for a different purpose, and its use for the purpose of documenting a locate operation was like "us[ing] a hammer to nail in a screw." Trial Tr. Vol. 2A at 298:7-301:4.

96. On August 2, 2012, Chambers and Crawford learned of a TelDig Mobile brochure, via Crawford's administrative assistant Gail Sternstein ("Sternstein"), who had received the brochure as a news alert. Trial Tr. Vol. 1B at 162:24-168:22; Trial Tr. Vol. 3B at 580:1-582:12; Sternstein Depo. Tr. at 49:15-51:15; Email from Sternstein to Chambers, re: Fwd: Mobile TelDig-page 2, August 2, 2012, DX-203; TelDig Mobile Product Brochure, DX-294.

97. The TelDig Mobile brochure included bullet point language that was identical to the bullet point language included in the MIR, describing the TelDig Mobile system. Further, the TelDig Mobile brochure included a partial picture of a drawing tool and its use on a large scale map image. Trial Tr. Vol. 1B at 168:24-170:5; TelDig Mobile Product Brochure, DX-294.

98. Upon receiving a copy of the TelDig Mobile brochure from Sternstein, Chambers and Crawford discussed the brochure with Nielsen. Trial Tr. Vol. 1B at 168:15-22; Trial Tr. Vol. 3B at 581:7-16. Chambers and Crawford concluded that the brochure did not contain any new or different information regarding TelDig's software from what they already knew or had previously learned from their interactions with TelDig. Trial Tr. Vol. 3B at 641:10-19. Thus, Nielsen, Chambers, and Crawford did not send the TelDig Mobile brochure to Teja and the brochure was not submitted to the PTO in relation to any of the Patents-in-Suit. Trial Tr. Vol. 2B at 362:1-12; Trial Tr. Vol. 3A at 479:3-16.

99. On October 17, 2012, Teja received an affidavit, supporting documents, and three images which were labeled as screen shots of the TelDig sketch tool, from Louis A. Simone ("Simone Affidavit"). The three TelDig screen shots were created by Premier Utility Services, who used a "personal highly customized version of Tel[D]ig that offer[ed them] special features to exceed [their] contract requirements ...." Trial Tr. Vol. 2B at 365:7-366:18; Affidavit of Louis A. Simone, DX-286.

100. Teja forwarded the Simone Affidavit and documents, on October 17, 2012, to Crawford and Travis Halky, a CertusView employee, asking for input "ASAP" because, if the information was material to e-Sketch, he needed to file an Information Disclosure Statement ("IDS") with the PTO to cite the information. Crawford then forwarded the information to Chambers. Trial Tr. Vol. 2B at 361:13-365:10; Email from Crawford to Chambers, re: FWD: URGENT-Please review ASAP, October 17, 2012, DX-221.

101. The three TelDig screen shots included with the Simone Affidavit bore a "striking" resemblance to e-Sketch, but no one at CertusView had seen this informa-

tion, or drawings of "this ilk," before. Trial Tr. Vol. 2B at 366:5-369:21. In particular, the three TelDig screen shots showed markings and measurements, similar to certain markings or tie-downs that might be made during a locate operation, on a Google Earth photo image. Affidavit of Louis A. Simone, DX-286.

102. Based on the Simone Affidavit, Teja concluded that "TelDig had a graphing tool on aerial images sometime after 2012." Trial Tr. Vol. 2B at 371:16-26. However, Teja viewed such information as an "admission of infringement rather than anything that resembled prior art," because the e-Sketch patent applications had been filed several years prior and the diagrams "looked like they plausibly could have been covered by the claims of the [e-Sketch] patent" several years after the priority dates of the applications. Trial Tr. Vol. 3A at 486:4-488:19.

103. Teja first received materials relevant to TelDig, that he believed might need to be included in a patent prosecution, in connection with the present litigation, as exhibits and materials from Ivan Zatkovich's ("Zatkovich") expert report. After receiving such materials, Teja cited such exhibits, materials, and Zatkovich's expert report in pending patent applications in the e-Sketch technology family and possibly other CertusView technology families. Trial Tr. Vol 3A at 479:3-23.

104. Even though TelDig materials, and Zatkovich's expert report, were cited in pending patent applications in the e-Sketch technology family, Teja has not received an Office Action rejection based on TelDig. Trial Tr. Vol. 3A at 484:3-18.

### G. Misrepresentation to the PTO

105. During prosecution of United States Patent Application No. 12/366,050, which ultimately issued as the '344 Patent, Examiner Nancy Bitar issued a non-final Office Action on October 6, 2011, rejecting claims 1-26 of such patent application as obvious, pursuant to 35 U.S.C. § 103(a), based on U.S. Pub. No. 2007/0219722 to Sawyer Jr. et. al. ("Sawyer") in view of U.S. Pub. No. 2006/0077095 to Tucker ("Tucker"). Complete File History U.S. Patent Application 12/366,050 ('344 Patent), 1133-44, DX-234 (hereinafter "'344 Patent File History, DX-234").

106. The inventions discussed in the Tucker and Sawyer references address the problem of underground facility maps, maintained by utility owners, that cannot be trusted. Trial Tr. Vol. 2B at 382:10-383:22. In particular, Page Tucker ("Mr. Tucker"), a named inventor on the Tucker reference, explained that his system was designed to eliminate the "problems" with marking facilities on the ground because the invention would "permanently capture and store" the location of utilities in a digital reference, which would later be used to notify the excavator—during excavation—that the excavator was "encroaching on a utility line and what type of line it is and how close they are." Tucker Depo. Tr. at 113:19-115:2. Mr. Tucker is not aware of anyone using his invention to "record the location of paint or flags," and the only time that he is aware of his invention being used in conjunction with paint or flags on the ground was to "test[ ] the system." Tucker Depo. Tr. at 117:9-23.

107. Examiner Bitar reviewed the '344 Patent as well as a number of CertusView's Virtual WhiteLine patents. Teja was familiar with Examiner Bitar, and had a good professional working relationship with Examiner Bitar. Trial Tr. Vol. 2B at 399:9-21; Email re: The "Six Families" (sounds like a Godfather remake), November 16, 2011, PX-072.

108. Teja interviewed Examiner Bitar on a number of occasions, including December 6, 2011 when Teja and Nielsen attended an examiner interview in Washington, D.C. with Examiner Bitar, and others, for the

pending '344 Patent application. Trial Tr. Vol. 2B at 401:14-402:1; Email from Teja to Nielsen, et al., re: Meeting with Examiners in D.C., November 28, 2011, DX-177.

109. During that examiner interview, Nielsen and Teja used a PowerPoint presentation to highlight certain information for Examiner Bitar. In part, the presentation discussed the Sawyer and Tucker references and sought to distinguish such references from the claimed inventions of the '344 Patent. Overview of U.S. Patent Application 12/366,853 for Examiner Nancy Bitar, December 6, 2011, PX-131.

110. During the examiner interview, Nielsen explained to Examiner Bitar what takes place in a conventional, prior art locate operation. Trial Tr. Vol. 2b at 414:14-815:14; Overview of U.S. Patent Application 12/366,853 for Examiner Nancy Bitar, December 6, 2011, 2-25, PX-131.

111. During the examiner interview, and following Nielsen's presentation, Teja directed Examiner Bitar's attention to several portions of the Tucker and Sawyer references, including paragraph 005 of the Tucker reference, which described a conventional locate operation, and paragraph 0014 of the Tucker reference, which Teja used to explain that the objective of both Tucker and Sawyer is to do away with conventional locate operations. Trial Tr. Vol. 2B at 419:14-423:13; Overview of U.S. Patent Application 12/366,853 for Examiner Nancy Bitar, December 6, 2011, 26-48, PX-131.

112. On February 13, 2012, after attending the examiner interview, Teja, Nielsen, and Chambers submitted an Amendment and Reply in response to the October 6, 2011 Office Action, pursuant to 37 C.F.R. § 1.111. Trial Tr. Vol. 3A at 431:14-24; '344 Patent File History, 688-711, DX-234.

113. In the February 13, 2012 Amendment and Reply, Teja gave a summary of the references cited in the October 6, 2011 Office Action. With respect to the Tucker reference, Teja explained that "Tucker is concerned primarily with assembling and providing an accurate database of locations of utility lines," and "the utility line location database created in support of Tucker's PI Grid is in no manner concerned with, or dependent on, the sites or locations of future ground-penetrating activities—rather, this database is only concerned with precision documentation of actual utility line location, wherever the utility lines may be located." With respect to the Sawyer reference, Teja explained that "Sawyer relates to the same system and methods disclosed in Tucker," and "beyond the teachings of Tucker, Sawyer is primarily concerned with maintaining a record of the activity of a field operator as the operator collects, edits, and/or updates data regarding the location of utility lines." '344 Patent File History, 700-06, DX-234.

114. Teja explained in the February 13, 2012 Amendment and Reply, that "the amendments to the independent claims are based at least in part on moving language previously recited in the preamble to the body of the claims so as to clarify the recitation of a **'locate operation,'** which is **completely absent from the cited prior art references.**" '344 Patent File History, 695, DX-234.

115. Teja continued, stating that "[f]urther support for the claim amendments relating to a locate **'ticket'** can be found throughout Applicant's specification as originally filed (e.g., *see* paragraphs [0002], [0003], [0023], and [0046]). As with a 'locate operation,' the concept of a **locate ticket** including information identifying a dig area to be excavated or disturbed during planned excavation activities, as now recited in Applicant's independent claims, is **completely absent from the cited prior art references.**" '344 Patent File History, 695, DX-234.

116. Teja made such statements because he was "advocating to the examiner" that Tucker and Sawyer "[esch]ewed the idea of a locate operation," intending to replace locate operations "with presumably something better." Trial Tr. Vol. 2B at 399:25-340:22

117. Further, in the February 13, 2012 Amendment and Reply, Teja stated that "[s]ince Tucker is not concerned with the location of planned excavation activities *per se*, Tucker similarly is not concerned with locate operations to identify a presence or absence of underground facilities within a specified dig area in advance of planned excavation activities in the dig area." '344 Patent File History, 703, DX-234.

118. Later in the February 13, 2012 Amendment and Reply, Teja stated that "[a]lso like Tucker, Sawyer is not concerned with the location of planned excavation activities per se, and thus similarly is not concerned with locate operations to identify a presence or absence of underground facilities within a specified dig area in advance of planned excavation activities at the dig area. As such, Sawyer also does not disclose or suggest any concepts related to documentation of a locate operation (e.g., a timestamp indicative of when the locate operation occurred)." '344 Patent File History, 706, DX-234.

119. Teja made such statements as part of his argument to Examiner Bitar in favor of patentability, attempting to show that Tucker and Sawyer disclosed a system that "obviates the need for physical marks on the ground entirely" and were distinguishable from the e-Sketch inventions claiming a locate operation, where the locator applies paint on the ground and digitally records the location of the locate mark. Trial Tr. Vol. 2B at 358:12-360:14.

120. On April 23, 2012, Examiner Bitar issued another Office Action, rejecting the amended claims of the '344 Patent on new grounds. The Examiner found that "Applicant's arguments, in the amendment filed 2/13/2012 with respect to the rejections of claims 1-26 under 35 U.S.C. 103(a) have been fully considered but are moot in view of the new ground(s) of rejection necessitated by the amendments. Therefore the rejection has been withdrawn. However, upon further consideration, a new ground (s) of rejection is made in view of Evans et al. (US 2008/021863)[ ("Evans") ]." '344 Patent File History, 652, DX-234.

121. In response to the April 23, 2012 Office Action, Teja submitted an Amendment and Reply on June 12, 2012. '344 Patent File History, 81-94, DX-234.

122. In the June 12, 2012 Amendment and Reply, Teja explained that "Sawyer and Evans fail to disclose or suggest all of the limitations of claim 1. In particular, Sawyer and Evans at least fail to disclose 'at least one digital representation of the at least one physical locate mark applied to ground, pavement or other surface by the locate technician during the locate operation.'" '344 Patent File History, 89, DX-234. Teja further reiterated that "Sawyer, which is directed to a 'system and method for generating a GIS data transaction' (Abstract) does not discuss physical locate marks at all." '344 Patent File History, 90, DX-234.

123. Examiner Bitar had and considered both the Tucker and Sawyer references during prosecution of the '344 Patent. Trial Tr. Vol. 2B at 397:6-398:2; '344 Patent, PX-001 (listing prior art submitted to the PTO).

124. Examiner Bitar ultimately issued a Notice of Allowability as to the '344 Patent, on July 11, 2012, over the Tucker, Sawyer, and Evans references. '344 Patent File History, 25-30, DX-234.

125. In the July 11, 2012 Notice of Allowability, Examiner Bitar stated that

"[a]fter reviewing the remarks made by the Applicant on 6/13/2012 in response to the non-final office action the Examiner finds the remarks to be persuasive. The combination of cited references Tucker et al. (US 2006/0077095), Sawyer et al. (US 2007/0219722), and Evans et al. (US 2008/0021863) [d]o not teach or suggest the features of claims or the newly added features. No other found prior art of record teaches or fairly suggests the combination of claims elements." '344 Patent File History, 28, DX-234.

126. The July 27, 2012 Notice of Allowability further stated that none of the prior art teaches: "[1] the locate operation comprising identifying, in advance of the planned excavation activities and using at least one physical locate mark applied to ground, pavement or other surface by the locate technician during the locate operation, a presence or absence of the at least one underground facility within the dig area identified by the ticket information; and [2] at least one digital representation of the at least one physical locate mark applied to the ground, pavement or other surface by the locate technician during the locate operation; and controls the communication interface and/or the memory to electronically transmit and/or electronically store the searchable electronic record of the locate operation so that performance of the location operation is verifiable." '344 Patent File History, 29, PX-234.

## VI. LEGAL STANDARD AND PRELIMINARY FINDINGS

### A. Duty of a Patent Applicant

"Each individual associated with the filing and prosecution of a patent application has a duty of candor and good faith in dealing with the [Patent and Trademark] Office, which includes a duty to disclose to the Office all information known to that individual to be material to patentability as defined in this section." 37 C.F.R. § 1.56(a); see Honeywell Int'l Inc. v. Universal Avionics Sys. Corp., 488 F.3d 982, 999 (Fed.Cir.2007); Molins PLC v. Textron, Inc., 48 F.3d 1172, 1178 (Fed.Cir. 1995) (citing Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co., 324 U.S. 806, 818, 65 S.Ct. 993, 89 L.Ed. 1381 (1945)). Individuals associated with the filing and prosecution of a patent application include: "(1) Each inventor named in the application; (2) Each attorney or agent who prepares or prosecutes the application; and (3) Every other person who is substantively involved in the preparation or prosecution of the application and who is associated with the inventor," or other relevant individuals.[14] 37 C.F.R. § 1.56(c). The duty to disclose exists as to each pending claim of a patent application until the "claim is cancelled or withdrawn from consideration, or the application becomes abandoned." Id. § 1.56(a). Conversely, "[t]here is no duty to submit information which is not material to the patentability of any existing claim." Id. Additionally, information that is material to patentability does not include information that is "cumulative to information already of record or being made of record in the application." Id. § 1.56(b).

A breach of such duty of candor and good faith constitutes inequitable conduct. Molins, 48 F.3d at 1178; Responsive Innovations, LLC v. Holtzbrinck Publishers, LLC, 911 F.Supp.2d 526, 543 (N.D.Ohio 2012) ("A breach of this duty [to prosecute patent applications in the PTO with candor, good faith, and honesty] constitutes inequitable conduct." (citing Molins, 48 F.3d at 1178)). The parties do not

14. "Individuals other than the attorney, agent or inventor may comply with this section by disclosing information to the attorney, agent, or inventor." 37 C.F.R. § 1.56(d).

dispute that each named inventor to the Patents-in-Suit and the attorney who prosecuted the Patents-in-Suit—that is, Nielsen, Chambers, Farr, and Teja—have a duty of candor and good faith to the PTO.

## B. Inequitable Conduct

 "Inequitable conduct is an equitable defense to patent infringement that, if proven, bars enforcement of a patent." Therasense, Inc. v. Becton, Dickinson & Co., 649 F.3d 1276, 1285 (Fed.Cir.2011) (en banc). To prevail on a defense or counterclaim of inequitable conduct, "the accused infringer must prove that the applicant misrepresented or omitted material information with the specific intent to deceive the PTO" and, at trial, must prove both materiality and specific intent "by clear and convincing evidence." Id. at 1287 (emphasis added) (citing Star Sci., Inc. v. R.J. Reynolds Tobacco Co., 537 F.3d 1357, 1365 (Fed.Cir.2008)). The Therasense standard also requires that the applicant have knowledge of such materiality. TransWeb, LLC v. 3M Innovative Properties Co., 812 F.3d 1295, 1303–04 (Fed.Cir.2016) ("A judgment of inequitable conduct requires clear and convincing evidence of materiality, knowledge of materiality, and a deliberate decision to deceive." (citing Therasense, 649 F.3d at 1290)). "If the accused infringer meets its burden, then the district court must weigh the equities to determine whether the applicant's conduct before the PTO warrants rendering the entire patent unenforceable." Therasense, 649 F.3d at 1287 (citing Star Sci., 537 F.3d at 1365). "[A]s a general rule, this doctrine should only be applied in instances where the patentee's misconduct resulted in the unfair benefit of receiving an unwarranted claim." Id. at 1292 (citing Star Sci., 537 F.3d at 1366).

As explained in Therasense, the above-stated remedy for inequitable conduct is "the 'atomic bomb' of patent law." Id. at 1288 (quoting Aventis Pharma S.A. v. Amphastar Pharm., Inc., 525 F.3d 1334, 1349 (Fed.Cir.2008) (Rader, J., dissenting)). Unlike other patentability deficiencies, inequitable conduct cannot be cured by reissue or reexamination of the patents at issue. Instead, "inequitable conduct regarding any single claim renders the entire patent unenforceable." Id. (citing Kingsdown Med. Consultants, Ltd. v. Hollister Inc., 863 F.2d 867, 877 (Fed.Cir.1988) (en banc)). "[T]he taint of a finding of inequitable conduct can spread from a single patent to render unenforceable other related patents and applications in the same technology family, ... endanger[ing] a substantial portion of a company's patent portfolio." Id. at 1288–89 (internal citations omitted). Further, a finding of inequitable conduct may prompt antitrust and unfair competition claims, "prove the crime or fraud exception to the attorney-client privilege," or support a finding that a case is "exceptional," leading to a potential award of attorneys' fees under 35 U.S.C. § 285. Id. at 1289 (internal citations omitted).

 "[T]he materiality required to establish inequitable conduct is but-for materiality." Id. at 1291. Regarding the withholding of prior art:

> When an applicant fails to disclose prior art to the PTO, that prior art is but-for material if the PTO would not have allowed a claim had it been aware of the undisclosed prior art. Hence, in assessing the materiality of a withheld reference, the court must determine whether the PTO would have allowed the claim if it had been aware of the undisclosed reference. In making this patentability determination, the court should apply the preponderance of the evidence standard and give claims their broadest reasonable construction.

Id. at 1291–92 (citations omitted). Similarly, where a party alleges that a patentee committed inequitable conduct by misrep-

resenting information to the PTO, such party must demonstrate that the specific alleged misrepresentation was but-for material. Id. at 1291. That is, the PTO would not have allowed the patent claim but for the patentee's misrepresentation. See, e.g., Apotex Inc. v. UCB, Inc., 763 F.3d 1354, 1361 (Fed.Cir.2014) (finding patentee's misrepresentations to be "but-for material" because "the PTO would not have allowed the '556 patent but for Dr. Sherman's misconduct"); Ohio Willow Wood Co. v. Alps S., LLC, 735 F.3d 1333, 1345 (Fed. Cir.2013) [hereinafter "Ohio Willow Wood (2013)"](citing Therasense, 649 F.3d at 1291). In determining whether the PTO would have allowed a claim but for the patentee's misrepresentation, a court should apply the preponderance of the evidence standard and give claims their broadest reasonable construction. Ohio Willow Wood (2013), 735 F.3d at 1345; Therasense, 649 F.3d at 1291.

The Federal Circuit has recognized a narrow exception to the requirement to prove but-for materiality in instances where a patent applicant engages in particularly egregious misconduct arising from " 'deliberately planned and carefully executed scheme[s]' to defraud the PTO and the courts." Therasense, 649 F.3d at 1292 (quoting Hazel–Atlas Glass Co. v. Hartford–Empire Co., 322 U.S. 238, 245, 64 S.Ct. 997, 88 L.Ed. 1250 (1944)). "When the patentee has engaged in affirmative acts of egregious misconduct, such as the filing of an unmistakably false affidavit, the misconduct is material." Id. (citations omitted). However, "neither mere nondisclosure of prior art references to the PTO nor failure to mention prior art references in an affidavit constitutes affirmative egregious misconduct, claims of inequitable conduct that are based on such omissions require proof of but-for materiality." Id. at 1292–93. Further, "[t]here is nothing wrong with advocating, in good faith, a reasonable interpretation of the teachings

of the prior art." Apotex Inc., 763 F.3d at 1361–62 (citing Rothman v. Target Corp., 556 F.3d 1310, 1328–29 (Fed.Cir.2009)). "While the law prohibits genuine misrepresentations of material fact, a prosecuting attorney is free to present argument in favor of patentability without fear of committing inequitable conduct." Rothman, 556 F.3d at 1328–29 (citing Young v. Lumenis, Inc., 492 F.3d 1336, 1348 (Fed.Cir. 2007)); accord Innogenetics, N.V. v. Abbott Labs., 512 F.3d 1363, 1379 (Fed.Cir.2008) (noting that counsel's representation "amounted to mere attorney argument" and explaining that "an applicant is free to advocate its interpretation of its claims and the teachings of prior art" (citing Life Techs., Inc. v. Clontech Labs., Inc., 224 F.3d 1320, 1326 (Fed.Cir.2000))). Instead, such limited exception to but-for materiality applies only when a patentee's omission or misrepresentation is knowing and deliberate. See Therasense, 649 F.3d at 1292 (citing Hazel–Atlas Glass, 322 U.S. at 245, 64 S.Ct. 997).

The Federal Circuit has emphasized in its opinions the distinction between the materiality and intent elements of an inequitable conduct counterclaim. "Intent and materiality are separate requirements." Id. at 1290 (citing Hoffmann–La Roche, Inc. v. Promega Corp., 323 F.3d 1354, 1359 (Fed.Cir.2003)). "A district court should not use a 'sliding scale,' where a weak showing of intent may be found sufficient based on a strong showing of materiality, and vice versa." Id. Importantly, "a district court may not infer intent solely from materiality." Id. Instead, "a court must weigh the evidence of intent to deceive independent of its analysis of materiality. Proving that the applicant knew of a reference, should have known of its materiality, and decided not to submit it to the PTO does not prove specific intent to

deceive." Id. (citing Star Sci., 537 F.3d at 1366).

Under the intent element of inequitable conduct, the party alleging inequitable conduct must demonstrate that the patentee acted with "the specific intent to deceive the PTO." Id. at 1290 (citing Star Sci., 537 F.3d at 1366). "A finding that the misrepresentation or omission amounts to gross negligence or negligence under a 'should have known' standard does not satisfy this intent requirement." Id. (quoting Kingsdown, 863 F.2d at 876). "[T]o meet the clear and convincing evidence standard, the specific intent to deceive must be 'the single most reasonable inference able to be drawn from the evidence.'" Id. (quoting Star Sci., 537 F.3d at 1366). Indeed, the evidence "'must be sufficient to require a finding of deceitful intent in the light of all the circumstances.'" Id. (quoting Kingsdown, 863 F.2d at 873). "Hence, when there are multiple reasonable inferences that may be drawn, intent to deceive cannot be found." Id. at 1290–91 (citing Scanner Techs. Corp. v. ICOS Vision Sys. Corp., 528 F.3d 1365, 1376 (Fed.Cir.2008)). Further, in the case of a nondisclosure of a prior art reference, "the accused infringer must prove by clear and convincing evidence that the applicant knew of the reference, knew that it was material, and made a deliberate decision to withhold it." Id. at 1290. "Because the party alleging inequitable conduct bears the burden of proof, the 'patentee need not offer any good faith explanation unless the accused infringer first ... prove[s] a threshold level of intent to deceive by clear and convincing evidence.'" Id. at 1291 (quoting Star Sci., 537 F.3d at 1368). "The absence of a good faith explanation for withholding a material reference does not, by itself, prove intent to deceive." Id.

## C. Inventorship

"Conception is the touchstone of inventorship, the completion of the mental part of invention." Burroughs Wellcome Co. v. Barr Labs., Inc., 40 F.3d 1223, 1227–28 (Fed.Cir.1994) (citing Sewall v. Walters, 21 F.3d 411, 415 (Fed.Cir.1994)). "'Conception is the formation in the mind of the inventor, of a definite and permanent idea of the complete and operative invention, as it is hereafter to be applied in practice.'" Ethicon, Inc. v. U.S. Surgical Corp., 135 F.3d 1456, 1460 (Fed.Cir.1998) (quoting Hybritech, Inc. v. Monoclonal Antibodies, Inc., 802 F.2d 1367, 1376 (Fed.Cir.1986))). An idea is sufficiently "definite and permanent" when "'only ordinary skill would be necessary to reduce the invention to practice, without extensive research or experimentation.'" Id. (quoting Burroughs Wellcome, 40 F.3d at 1228).

"A joint invention is the product of collaboration between two or more persons working together to solve the problem addressed." Univ. of Pittsburgh of Commonwealth Sys. of Higher Educ. v. Hedrick, 573 F.3d 1290, 1297 (Fed.Cir. 2009) (citing 35 U.S.C. § 116). "In a joint invention, each inventor must contribute to the joint arrival at a definite and permanent idea of the invention as it will be used in practice." Id. at 1298 (citing Price v. Symsek, 988 F.2d 1187, 1229 (Fed.Cir. 1993)). Joint inventors "need not work physically together or contemporaneously ... nor must each inventor contribute equally or to each claim of the patent." Id. (citing 35 U.S.C. § 116).

"All that is required of a joint inventor is that he or she (1) contribute in some significant manner to the conception or reduction to practice of the invention, (2) make a contribution to the claimed invention that is not insignificant in quality, when that contribution is measured against the dimension of the full inven-

tion, and (3) do more than merely explain to the real inventors well-known concepts and/or the current state of the art."

Israel Bio–Eng'g Project v. Amgen, Inc., 475 F.3d 1256, 1263–64 (Fed.Cir.2007) (quoting Pannu v. Iolab Corp., 155 F.3d 1344, 1351 (Fed.Cir.1998)). However, "one does not qualify as a joint inventor by merely assisting the actual inventor after conception of the claimed invention." Ethicon, Inc., 135 F.3d at 1460 (citing Sewall, 21 F.3d at 416–17; Shatterproof Glass Corp. v. Libbey–Owens Ford Co., 758 F.2d 613, 624 (Fed.Cir.1985)). Moreover, depending on the scope of the patent claims at issue, "one of ordinary skill in the art who simply reduced the inventor's idea to practice is not necessarily a joint inventor, even if the specification discloses that embodiment to satisfy the best mode requirement." Id. (citing Sewall, 21 F.3d at 416).

## VII. FACTUAL AND LEGAL ANALYSIS OF S&N'S CLAIMS

As noted above, S&N has asserted five grounds for a claim of inequitable conduct against CertusView: (1) Nielson, Chambers, Teja, and Farr (to the extent that he is named as an inventor) failed to disclose as prior art the ESRI ArcPad software during prosecution of the '344 and '204 Patents; (2) Nielson, Chambers, Teja, and Farr (to the extent that he is named as an inventor) failed to disclose as prior art the TelDig Utility Suite and TelDig Mobile software during prosecution of the Pat-

ents-in-Suit; (3) Nielsen, Chambers, Teja, and Farr wrongfully named Farr as an inventor on the '204 and '341 Patents; (4) Nielsen, Chambers, Teja, and Farr (to the extent that he is named as an inventor) failed to name Block as an inventor of the '359, '344, '204, and '341 Patents; and (5) Nielsen, Chambers, and Teja made material misrepresentations to the PTO concerning the Sawyer/Tucker references during prosecution of the '344 Patent. The Court will address each argument in turn.

### A. Failure to Disclose Prior Art

#### 1. ESRI ArcPad

S&N asserts that Nielsen, Chambers, Farr, and Teja committed inequitable conduct by failing to disclose as prior art the ESRI ArcPad software during prosecution of the '344 and '204 Patents.[15] S&N asserts that the ESRI ArcPad software is material prior art and Nielsen, Chambers, Farr, and Teja withheld ESRI ArcPad prior art during prosecution of the '344 and '204 Patents with the specific intent to deceive the PTO.[16] In response, CertusView argues that S&N failed to identify specific ESRI ArcPad prior art that CertusView allegedly withheld from the PTO, and that S&N failed to demonstrate that the ESRI ArcPad prior art discussed at trial is but-for material. Instead, CertusView argues, the specific ESRI prior art references that CertusView learned of during prosecution of an unrelated patent, and which CertusView cited during prosecution of the '341, '359, and '001 Patents, were not material because they were cumulative of other prior art CertusView had already submitted

15. As noted above, S&N did not identify any specific ESRI prior art reference as material, nor did it enter any ESRI prior art into evidence in this matter. However, as significant testimony regarding the ESRI ArcPad software product, as well as the specific ESRI prior art references CertusView cited during the prosecution of the '001, '341, and '359 Patents, was elicited at trial, the Court will consider S&N's arguments regarding both the

ESRI ArcPad software and the specific ESRI prior art references discussing the ESRI ArcPad software.

16. The Court notes that S&N appears to have abandoned its argument that CertusView intentionally withheld ESRI ArcPad prior art references during prosecution of the '344 Patent, discussing only the '204 Patent in its Post-Trial Brief.

to the PTO during prosecution of the '344 and '204 Patents. Finally, CertusView argues, S&N has not demonstrated that CertusView withheld ESRI ArcPad prior art with the specific intent of deceiving the PTO regarding ESRI.

The Court finds that S&N has not demonstrated, by clear and convincing evidence, that CertusView withheld material ESRI ArcPad prior art with the specific intent of deceiving the PTO during prosecution of the '204 and '344 Patents.[17] First, S&N has not demonstrated that the ESRI ArcPad software is but-for material.[18] Further, other specific ESRI prior art references that CertusView was aware of, and provided to the PTO during prosecution of the '341, '359, and '001 Patents, are not material, but are cumulative of other references that CertusView provided to the PTO during prosecution of the '204 and '344 Patents. Second, S&N has not demonstrated that CertusView withheld the ESRI ArcPad software, or any specific ESRI prior art references, during prosecution of the '204 and '344 Patents with the specific intent to deceive the PTO.

 First, with respect to the materiality of the ESRI ArcPad prior art, "[b]ecause the analysis of this but-for materiality requirement is from the perspective of the PTO, [the Court] appl[ies] the preponderance of the evidence standard in assessing whether the withheld or misrepresented information would have blocked patentability." Ohio Willow Wood (2013), 735 F.3d at 1345 (citing Therasense, 649 F.3d at 1291–92). Specifically, S&N asserts that, had CertusView provided the ESRI ArcPad software to the PTO, the '204 Patent would have been "blocked" because ESRI ArcPad anticipated or made obvious such patents as it had the capability of marking up a photographic image—the matter at issue in dependent claim 17 of the '204 Patent ("[t]he method of claim 1, wherein the at least one input image comprises at least one photographic image.").[19] Defs.' Post-Trial Br., 17, ECF No. 517. However, S&N has not proven that ESRI ArcPad possessed such functionality. S&N has introduced no evidence that a version of ESRI ArcPad, capable of marking up a photographic image, was prior art to the '204 and '344 Patents. Instead, Dr. Dymond testified that ESRI ArcPad software "out of the box," that is, absent additional personal programming and customization, was unable to store a digital representation of a physical locate mark, or do "ticketing" or "digital representation" of physical locate marks.[20] Trial Tr. Vol. 5A at 1010:14-1011:2, 1011:15-1012:18.[21]

17. It is undisputed that CertusView cited at least four specific ESRI prior art references during prosecution of the '001, '341, and '359 Patents. See supra ¶ 85.

18. The parties do not appear to dispute that some version of the ESRI ArcPad software is prior art to the Patents-in-Suit.

19. The Court notes that, while S&N does not address in its Post-Trial Brief whether the ESRI ArcPad software would have blocked issuance of the '344 Patent, claim 1 of the '344 Patent describes an apparatus which can process a searchable electronic record that contains a similarly marked-up digital image. '344 Patent, Col. 17:40-18:14, PX-001.

20. At trial, S&N cross-examined Dr. Dymond on an image created by ESRI ArcMap software, a desktop application that might be used to mark up an image. Trial Tr. Vol. 5B at 1069:13-1070:13. However, as Dr. Dymond explained, such image was created by a separate ESRI product, and ESRI ArcPad does not possess such functionality absent additional programming and customization.

21. At trial, S&N's own expert, Ivan Zatkovich, did not provide an opinion regarding the materiality of any specific ESRI reference or publication, determining in his expert report only that TelDig was material in view of the ESRI software products. Trial Tr. Vol. 4B at 906:13-15. However, the Court finds such combination to be unpersuasive as S&N has

■ Further, with respect to the specific ESRI prior art references that CertusView learned of during prosecution of an unrelated patent application, CertusView did not have a duty to submit such specific prior art references during prosecution of the '204 and '344 Patents. First, the '344 Patent had already issued when Teja, and other CertusView employees, became aware of the specific ESRI prior art references discussed at trial. S&N has not demonstrated that any CertusView employee, or Teja, knew of such references until <u>after</u> the '344 Patent had issued. Thus, CertusView did not have a duty to disclose such specific prior art references with respect to the '344 Patent. <u>See</u> 37 C.F.R. § 1.56(a). Second, CertusView did not have a duty to submit the specific ESRI prior art references during prosecution of the '204 Patent because such references are cumulative of other references that CertusView provided to the PTO and are not material. <u>See</u> 37 C.F.R. § 1.56(b). "A reference is cumulative when it 'teaches no more than what a reasonable examiner would consider to be taught by the prior art already before the PTO.'" <u>Regeneron Pharm., Inc. v. Merus B.V.</u>, 144 F.Supp.3d 530, 560–61 (S.D.N.Y.2015) (quoting <u>Regents of the Univ. of Cal. v. Eli Lilly & Co.</u>, 119 F.3d 1559, 1575 (Fed.Cir.1997)). Alternatively, "[w]hen a particular reference discloses a limitation of particular importance not elsewhere disclosed, it is not cumulative." <u>Id.</u> (citing <u>McKesson Info. Sols, Inc. v. Bridge Med., Inc.</u>, 487 F.3d 897, 914 (Fed.Cir.2007)). As Teja testified at trial, the specific ESRI prior art references provide information, regarding the use of GIS software to record data regarding utilities, similar to the information that forms the basis of the Tucker, Sawyer, and Evans references that CertusView provided to the PTO during prosecution of the '204 Patent. Thus, the specific ESRI prior art references are cumulative and not material as they "teach[ ] no more than what a reasonable examiner would consider to be taught by the prior art already before the PTO." <u>Id.</u>

Additionally, the fact that the '359, '341, and '001 Patents issued over specific ESRI prior art references indicates that such references are not but-for material with respect to the '204 Patent. Having reviewed the specific ESRI prior art references, which S&N argues should have been submitted during prosecution of the '204 Patent, the examiner determined that such references did not "block" issuance of the '359, '341, and '001 Patents. Therefore, S&N has not demonstrated that either the ESRI ArcPad product, of which CertusView was aware from the MIR and its own interactions with ESRI, or the specific cited ESRI prior art references, that CertusView learned of during prosecution of an unrelated patent, are

not demonstrated that the ESRI ArcPad software, or the TelDig products (as discussed below), had the necessary functionality to record and store a digital representation of a physical locate mark. <u>See</u> <u>Dome Patent L.P. v. Lee</u>, 799 F.3d 1372, 1379 (Fed.Cir.2015) (explaining that the prior art and the inventions claimed must be, in part, similar enough such that " 'the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art' " (quoting 35 U.S.C. § 103 (2006))). Further, even if such functionality existed in the prior art, S&N has not demonstrated that

there existed the appropriate motivation to combine the teachings in such prior art references and a reasonable expectation of success in making such combination. <u>See Id.</u> at 1380 ("If all elements of a claim are found in the prior art, ... the factfinder must further consider the factual questions of whether a person of ordinary skill in the art would be motivated to combine those references, and whether in making that combination, a person of ordinary skill would have had a reasonable expectation of success." (citing <u>Medichem, S.A. v. Rolabo, S.L.</u>, 437 F.3d 1157, 1164 (Fed.Cir.2006))).

but-for material to the issuance of the '204 and '344 Patents.

■ Second, even if ESRI prior art were but-for material, S&N has not demonstrated that CertusView withheld the ESRI ArcPad software, or any specific ESRI prior art references, during prosecution of the '204 and '344 Patents with the specific intent to deceive the PTO. As noted above, a finding of intent must be " 'the single most reasonable inference able to be drawn from the evidence.' " Therasense, 649 F.3d at 1290 (quoting Star Sci., 537 F.3d at 1366). The single most reasonable inference to be drawn from the evidence in this matter is that the reason CertusView did not submit ESRI ArcPad prior art to the PTO, or to Teja, during prosecution of the '204 and '344 Patents was because it believed the ESRI ArcPad software to be incompatible with its e-Sketch inventions. CertusView reviewed the ESRI software and determined that it was "too big and too expensive" to use with e-Sketch, which led it to conclude that ESRI was not material or relevant to its e-Sketch inventions. However, upon learning of specific ESRI prior art references, CertusView and Teja submitted those references to the PTO, "in an abundance of caution," during prosecution of the '359, '341, and '001 Patents, further belying any suggestion that CertusView intended to deceive the PTO. Each Patent issued over the ESRI references, lending credence to CertusView's belief that such references, and the ESRI ArcPad software, were not material. Thus, S&N has not demonstrated that CertusView withheld material ESRI prior art during prosecution of the '204 and '344

Patents with the specific intent to deceive the PTO.

S&N has attempted to prove CertusView's intent to deceive the PTO by arguing that CertusView's misconduct during discovery regarding the MIR (which includes descriptions of both ESRI and TelDig products) supports a "strong inference" of deceptive intent, because there is an "unmistakable" connection between the litigation misconduct regarding the MIR and the alleged withholding of material prior art, described in the MIR, from the PTO. Defs.' Post-Trial Br. at 14. In support of its argument, S&N relies on a recent decision from the Federal Circuit in the Ohio Willow Wood case, 813 F.3d 1350 (Fed.Cir.2016) [hereinafter "Ohio Willow Wood (2016)"], affirming the district court's finding that a patent applicant committed inequitable conduct. However, the Ohio Willow Wood applicant's conduct differs from the conduct at issue in this case, because such applicant had a duty to submit specific documents, which discussed prior art, to the PTO during patent reexamination as such documents could correct his counsel's misrepresentation on a key point of contention during such reexamination, because the applicant withheld such documents, and because the applicant "had no explanation for his failure to present [such documents]" to the PTO. Id. at 1359–60. CertusView, however, did not have a duty to submit the MIR to the PTO [22] and did not withhold the information contained in the MIR from the PTO with knowledge of its materiality. Instead, the evidence reflects that CertusView culled through the approximately fifty companies, and

---

**22.** CertusView did not have a duty to submit the MIR to the PTO because it is not material prior art. Instead, the MIR was a confidential "draft" document, created after the priority dates of the Patents-in-Suit, including market research on approximately fifty companies and their products, both material and non-

material to the e-Sketch inventions. See infra Sect. VII.A.2.a. Further, S&N concedes that the MIR was not prior art, Trial Tr. Vol. 5B at 1158:9-11, instead referring to such document as a "compendium of prior art," Defs.' Post-Trial Rebuttal Br. at 11.

their products, identified in the MIR and provided to its patent counsel and the PTO information regarding such companies and products that it believed to be relevant and material to the e-Sketch inventions. CertusView disregarded the ESRI and TelDig information in the MIR because it believed, based on its interactions with ESRI and TelDig, that such information was incorrect. Thus, while CertusView's misconduct during discovery is worthy of condemnation and sanction,[23] such misconduct does not evidence the specific intent to deceive the PTO.

For these reasons, S&N has not demonstrated that the ESRI ArcPad software is but-for material to the '204 and '344 Patents, or that such software was withheld during prosecution of the '204 and '344 Patents with the specific intent to deceive the PTO. Therefore, the Court concludes that S&N has not demonstrated that CertusView committed inequitable conduct related to the ESRI ArcPad software.

### 2. TelDig Utility Suite and TelDig Mobile

S&N asserts that Nielson, Chambers, Teja, and Farr committed inequitable conduct by failing to disclose as prior art the TelDig Mobile software during prosecution of the Patents-in-Suit.[24] S&N asserts that the TelDig Mobile software is material prior art because such product predated the priority dates of the Patents-in-Suit

and is capable of meeting an "essential" and "salient" claim limitations of the e-Sketch patents, namely, the ability to electronically record physical locate marks on a digital image.[25] Defs.' Post-Trial Br. at 6-9. Further, S&N asserts that Nielsen, Chambers, Farr, and Teja withheld such product during prosecution of the Patents-in-Suit with the specific intent to deceive the PTO. In response, CertusView argues that S&N failed to demonstrate that the TelDig Mobile product is prior art or that such product was but-for material. Finally, CertusView argues, S&N has not demonstrated that CertusView withheld TelDig Mobile prior art with the specific intent of deceiving the PTO regarding TelDig.

The Court finds that S&N has not demonstrated, by clear and convincing evidence, that CertusView withheld material TelDig Mobile prior art with the specific intent of deceiving the PTO during prosecution of the Patents-in-Suit. First, while some version of the TelDig Mobile product appears to be prior art, and within CertusView's knowledge, S&N has not demonstrated that such product was but-for material. And, second, S&N has not demonstrated that CertusView withheld such TelDig Mobile product, or any specific TelDig prior art reference, during prosecution of the Patents-in-Suit with the specific intent to deceive the PTO.

---

**23.** Indeed, sanctions were already imposed on CertusView for its litigation misconduct on September 1, 2015. ECF No. 364.

**24.** The Court notes that S&N appears to have abandoned its argument that CertusView intentionally withheld the TelDig Utility Suite product during prosecution of the Patents-in-Suit. At trial, S&N failed to introduce evidence of the TelDig Utility Suite product's capabilities or use, much less any documentary evidence regarding such product. Further, S&N's Post-Trial brief does not address the TelDig Utility Suite product, discussing only the TelDig Mobile product. Therefore, as it

has no evidence regarding the TelDig Utility Suite product to consider, the Court cannot find that CertusView committed inequitable conduct by intentionally withholding the TelDig Utility Suite product from the PTO during prosecution of the Patents-in-Suit.

**25.** At trial, the element of "marking up a digital image" was described as "essential," by Chambers, Trial Tr. Vol. 2A at 291:3-11, and Teja described the element of making a "digital representation of at least one physical locate mark" as "one of the salient considerations of the claims," Trial Tr. Vol. 2B at 379:21-380:3.

### a. Materiality

■ At least some version of the Tel-Dig Mobile product is prior art to the Patents-in-Suit because such product was "known or used by others in this country" before the filing dates of the Patents-in-Suit, 35 U.S.C. § 102(a) (2006) (current version at 35 U.S.C. § 102(a) (Mar. 16, 2013)), or such product was "in public use or on sale in this country" more than one year before the Patents-in-Suit were filed, id. § 102(b).[26] Further, the TelDig Mobile product falls within the scope of prior art because it is " 'reasonably pertinent to the particular problem with which the [e-Sketch] invention was involved.' " Ruiz v. A.B. Chance Co., 234 F.3d 654, 664 (Fed. Cir.2000) (quoting Stratoflex, Inc. v. Aeroquip Corp., 713 F.2d 1530, 1535 (Fed.Cir. 1983)). The '359, '344, '341, and '204 Patents claim priority to a parent application filed on February 12, 2008, and the '001 Patent claims priority to a parent application filed on March 13, 2007. Prior to those dates, TelDig was involved in developing products for infrastructure intervention and damage prevention, including products that aided in and contributed to the locate operation field. Chambers participated in a demonstration of TelDig products, including TelDig Utility Suite and TelDig Mobile, in 2007. Additionally, the MIR sourced its information on relevant market players and products, including TelDig Utility Suite and TelDig Mobile, between May and June 2008, indicating that information regarding the products discussed in the MIR was publicly available prior to May 2008. Further, the TelDig Mobile brochure indicates that the TelDig Mobile product, among others, was being marketed before the priority dates of the Patents-in-Suit. While the date of the TelDig Mobile brochure's creation is unknown, Zatkovich testified that he observed such document recorded, on March 12, 2006, on the Internet Archive. Trial Tr. Vol 4B at 848:11-849:12; see also Trial Tr. Vol 5A at 1054:13-23 (explaining Dr. Dymond's agreement that the TelDig Mobile brochure was created in the 2004 timeframe).[27]

While a description of the full capabilities of the TelDig Mobile prior art product was not introduced at trial, the evidence at trial indicates that such product includes some type of "drawing editor" or drawing tool. The MIR stated that TelDig Mobile had a "[u]nique, easy-to-use drag-and-drop drawing module with pre-formatted icons to send a layout of the dig and locate site." MIR at 77. Additionally, by spring 2008, Chambers knew that TelDig had a drawing tool that would allow a product user to mark up a digital image to show a notification perimeter or shape.[28] Trial Tr. Vol 2A

26. The Court cites to a version of 35 U.S.C. § 102 that predates the America Invents Act, Pub. L. No. 112-29, 125 Stat. 284 (2013), because each of the Patents-in-Suit claim priority to applications filed before the effective date of the America Invents Act, March 16, 2013, making the prior version of § 102 applicable to the Patents-in-Suit.

27. While the TelDig Mobile brochure demonstrates that some version of the TelDig Utility Suite and TelDig Mobile products, and some version of TelDig Mobile's drawing module, are prior art to the Patents-in-Suit, S&N has not demonstrated that either CertusView or its patent counsel received or reviewed such document prior to August 2, 2012. Further, the Court need not address whether the TelDig Mobile brochure is prior art because, as discussed below, even if such document is prior art, it is not material.

28. The record is unclear regarding how Chambers learned this information. The Court notes that Chambers did not observe a demonstration of TelDig's drawing tool during the presentation he participated in with TelDig in 2007. Trial Tr. Vol. 1B at 215:1-216:10. However, Chambers received additional information regarding TelDig through CertusView's 2008 NDA and 2009 integration agreement with TelDig.

at 283:19-24, 287:7-12. Further, the TelDig Mobile brochure demonstrates that the TelDig Mobile product included a "drawing editor," as evidenced by a small partial picture of such tool in the lower right-hand corner of the document. TelDig Mobile Product Brochure, DX-294.

S&N, however, has not demonstrated that any version of the TelDig Mobile product is but-for material because S&N has not demonstrated that issuance of the Patents-in-Suit would have been "blocked" if such product had been provided to the PTO. See Ohio Willow Wood (2013), 735 F.3d at 1345 (citing Therasense, 649 F.3d at 1291–92). Even if the claims of the Patents-in-Suit were reduced to the "essential" or "salient" feature of electronical-ly recording physical locate marks on a digital image,[29] S&N has not demonstrated that the TelDig Mobile product was capable of making such electronic record.

■ Looking specifically to S&N's anticipation evidence, S&N has not proven that the TelDig Mobile product anticipated every element and limitation of any claim in the Patents-in-Suit.[30] "Invalidation on [grounds of anticipation] requires that every element and limitation of the claim was previously described in a single prior art reference, either expressly or inherently, so as to place a person of ordinary skill in possession of the invention." Sanofi–Synthelabo v. Apotex, Inc., 550 F.3d 1075, 1082 (Fed.Cir.2008) (citations omitted). S&N presented evidence via Zatkovich, its expert witness,[31] that the TelDig Mobile

29. The Court notes that a prior art reference disclosing an essential limitation of an invention may be material, even if a patent is not found to be invalid based on such reference or no element-by-element invalidity analysis is performed with respect to other limitations of the asserted claims. See Am. Calcar, Inc. v. Am. Honda Motor Co., 768 F.3d 1185, 1189 (Fed.Cir.2014) (explaining that the PTO and courts employ different evidentiary standards for claim construction, thus " 'even if a district court does not invalidate a claim based on a deliberately withheld reference, the reference may be material if it would have blocked patent issuance under the PTO's different evidentiary standards.' " (quoting Therasense, 649 F.3d at 1291–92)); cf. Ohio Willow Wood (2016), 813 F.3d at 1359 (affirming district court's finding that non-disclosure of letters discussing prior art were material because they spoke to "the dispositive issue," corroboration).

30. At trial, S&N appeared to be prepared to present evidence, via Zatkovich's expert testimony, that certain TelDig products were material because, if such products had been provided to the PTO during prosecution of the Patents-in-Suit, the Patents-in-Suit would not have issued on grounds of both anticipation and obviousness. Trial Tr. Vol. 4B at 846:20-847:4, 887:9-14 (discussing Zatkovich's obviousness conclusion in his expert report). However, Zatkovich only briefly discussed obviousness, testifying almost entirely regarding the TelDig Mobile product's anticipation of the e-Sketch product, or the TelDig Mobile product's ability to perform the "essential" features of the e-Sketch invention, and did not introduce any additional evidence regarding the obviousness conclusion that he disclosed in his expert report. Further, S&N's Post-Trial Brief does not argue that TelDig rendered e-Sketch obvious. Thus, S&N has not demonstrated that the TelDig products would have blocked issuance of the Patents-in-Suit on the basis of obviousness. See Dome Patent L.P., 799 F.3d at 1379–80 (Fed.Cir.2015) (discussing the legal standard for demonstrating the obviousness of a claim for the purpose of invalidating such claim); supra n.21. As such, the Court cannot find that the TelDig products are material on such a basis.

31. The Court notes that it has only considered Zatkovich's testimony for the purpose of determining whether the TelDig Mobile product anticipates the Patents-in-Suit, as Zatkovich did not apply the proper test for determining but-for materiality and is not qualified to determine whether the TelDig Mobile product was but-for material to issuance of the Patents-in-Suit. Trial Tr. Vol. 4B at 880:14-883:18 (discussing Zatkovich's application of the "reasonable examiner" test for materiality-a standard that predates the Therasense decision).

product anticipated claim 1 of the '204 Patent.[32] Trial Tr. Vol. 4B at 850:16-851:25. However, Zatkovich's opinion is insufficient to demonstrate that the TelDig Mobile product anticipated claim 1 of the '204 Patent, much less any claim of the Patents-in-Suit, because Zatkovich could not identify a version or model of the TelDig Mobile prior art, or a singular TelDig reference, evidencing that the TelDig Mobile product could meet every element or limitation of a claim in the Patents-in-Suit. Instead, Zatkovich based his anticipation opinion upon multiple TelDig press releases, which CertusView did not receive and were not entered into evidence, and the TelDig Mobile brochure, which CertusView did not receive or review until 2012. Trial Tr. Vol. 4B at 853:13-855:18, 875:11-877:4. For example, Zatkovich relied on a TelDig press release that stated "TelDig Mobile has the unique feature of being able to create and handle dig site sketches which become precious information coming back from the field with the completed ticket, useful when damages occurs," in combination with the TelDig Mobile brochure, to opine that TelDig Mobile's drawing editor was able to record locate marks on the ground. Trial Tr. Vol. 4B at 895:12-23.

[W]e know that TelDig Mobile has the ability to complete locator reports which include marked up sketches. We know that. It says that specifically in the brochure. We know that—and from that, I used this information to say it necessarily has to contain locate marks, otherwise the[re] will not be precious information when damages occur.

Trial Tr. Vol 4B at 896:2-8.[33] However, Zatkovich could not point to a specific version of TelDig Mobile prior art, or singular TelDig prior art reference, in which each of the elements and limitations of a single e-Sketch patent claim is described and compare such reference against any claim in the Patents-in-Suit.[34] Trial Tr. Vol. 4B at 897:4-901:24. Thus, S&N did not demonstrate that the TelDig Mobile product anticipated any of the claims of the Patents-in-Suit.

Further, even if the Court limited its consideration of anticipation to the "essential" and "salient" claim limitations included in claim 1 of the Patents-in-Suit, that is, the ability to electronically record physical locate marks on a digital image, S&N has not demonstrated that the TelDig Mobile product possessed such functionality. At trial, S&N failed to demonstrate that: (1) the TelDig Mobile drawing tool had the resolution necessary to record locate marks on an image; (2) the TelDig Mobile product had the ability to track and record

---

**32.** Zatkovich did not discuss at trial any specific claims within the '359, '341, '344, or '001 Patents which he argues are anticipated by the TelDig Mobile product, although certain portions of Zatkovich's expert report regarding these patents was discussed during cross-examination.

**33.** The Court notes that it is skeptical of Zatkovich's interpretation of the prior art references he relied on for his anticipation opinion, particularly in light of Zatkovich's testimony that he did not possess personal knowledge of how the TelDig products operate. Trial Tr. Vol. 4B at 876:24-877:16, 879:8-880:6. However, as Zatkovich was not able to compare all elements and limitations of a single claim of the Patents-in-Suit against a singular TelDig prior art reference, the Court need not consider the efficacy of Zatkovich's partial comparison at trial.

**34.** Zatkovich testified that, while he could not point to a singular TelDig reference that discussed all the elements and limitations of a claim, he mapped at least one documentary reference, that he believed described some aspect of TelDig Mobile, against each limitation of a claim. Trial Tr. Vol. 4B at 888:4-22. However, as noted above, the only TelDig document in evidence, or that CertusView was aware of and reviewed, and that Zatkovich relied upon for his opinions, is the TelDig Mobile brochure.

specific geographical location data associated with a locate mark; and (3) the TelDig Mobile product was capable of producing the necessary locate data in a searchable electronic record.

First, S&N has not demonstrated that the TelDig Mobile drawing tool had the resolution capabilities necessary to allow a locate technician to make a digital representation of a physical locate mark. The goal of e-Sketch was to electronically document locate operations "[w]ith a high level of specificity," Trial Tr. Vol. 2A at 289:25-290:4, and e-Sketch can display an image "at six inches per pixel," Trial Tr. Vol. 4B at 783:11-18. While e-Sketch's resolution capability is not detailed in the claims of the Patents-in-Suit, each of the Patents-in-Suit inherently require a digital image to be displayed with "sufficient resolution" such that a locate mark, that is, a small paint mark or flag, can be recorded on such image. See '204 Patent, Col. 19:48-50, PX-002 ("Generally, [input images] may be of sufficient resolution at an optimal elevation to be useful as a record of the locate operation."); '344 Patent, Col. 7:55-58, PX-001 (same); '341 Patent, Col. 19:58-61, PX-005 (same); '359 Patent, Col. 7:54-56 (same); cf. '001 Patent, PX-004 (describing inventions to both mark the ground and record such locate marks for display on a separate device). Additionally, S&N's expert agreed, in response to the Court's question, that a record of a locate mark must be able to provide specific information, and a locate mark cannot be recorded

on a "one mile by one mile square" basis or on a "one block by one block square" basis. Trial Tr. Vol. 4B at 856:24-857:18; see Trial Tr. Vol. 5A at 926:14-927:11 (explaining that "in order to be reasonably useful," the accuracy of a sketch tool would need to be within "two to four feet").

Evidence at trial, however, indicates only that TelDig Mobile's drawing tool has resolution sufficient to display a large geographic area, several blocks or more in size. See TelDig Mobile Product Brochure, DX-2 94 (displaying what appears to be several square miles at "IX Zoom" in a partial photo of the TelDig Mobile "drawing editor"). Further, both Chambers and Farr testified that TelDig's One Call drawing tool, representative of the sketching capabilities across TelDig's products, did not have the capability for a user to input specific utilities, tie-downs, or landmarks on a highly specific geographic area, because the drawing tool was used to show a perimeter or shape on a large geographic area. Trial Tr. Vol. 2A at 221:12-227:13; Trial Tr. Vol. 4A at 774:1-777:4; Email Re: TelDig Systems—TelDig Web Drawing Tool Integration-vl 10.doc, PX-057 (displaying an image of a three-block area in a drawing tool used for TelDig's One Call product).[35]

At trial, Zatkovich provided the only testimony that the TelDig Mobile product could display an image with sufficient resolution to allow a user to record a locate mark. However, the Court is unpersuaded by Zatkovich's testimony because such

---

**35.** In determining whether the TelDig drawing tool possessed sufficient resolution capabilities, the Court does not consider the TelDig sketch tool screen shots provided to CertusView with the Simone Affidavit in October 2012, DX-286. First, the screen shots are undated and the tool is part of a "highly customized version of Tel[D]ig that offer[ed] special features to exceed [ ] contract requirements ...." Trial Tr. Vol. 2B at 365:7-366:18; Affidavit of Louis A. Simone, DX-

286. Further, upon viewing such screen shots, CertusView determined that it had never seen such information, or drawings of "this ilk," before. Trial Tr. Vol. 2B at 366:5-369:21. Thus, based on the evidence at trial, it appears that such screen shots do not accurately represent the capabilities of the TelDig drawing tool prior art, much less that CertusView was aware of such capabilities and withheld such information from the PTO.

conclusion is uncorroborated, and Zatkovich came to such opinion by inference based on a combination of multiple non-technical press releases and the TelDig Mobile brochure. Trial Tr. Vol. 4B at 853:13-855:18, 875:11-877:4. Further, Zatkovich did not participate in any demonstration of TelDig Mobile product, Trial Tr. Vol. 4B at 876:24-877:8, did not speak to or contact anyone at TelDig for information, Trial Tr. Vol. 4B at 879:8-880:6, or purchase or use TelDig Mobile software, Trial Tr. Vol. 4B at 889:2-17. Thus, S&N has not demonstrated that the TelDig Mobile drawing tool could display an image with sufficient resolution to allow for a digital representation of a physical locate mark.

Second, S&N has not demonstrated that the TelDig Mobile product had the ability to track and record specific geographical location data, as required by certain of the Patents-in-Suit. Claim 1 of both the '359 and '001 Patents requires that "geographic coordinates" or "location data" be associated with the individual locate marks. '359 Patent, Col. 18:4-12, PX-003 (requiring that the "data set comprise[, in part,] a set of geographic points along a marking path of the at least one underground facility, the set of geographic points including geographical coordinates corresponding to the at least one physical locate mark ..."); '001 Patent, Col. 8:19-28, PX-004 (requiring the system for electronically displaying locate information to comprise "a processor to receive location data relating to the use of the marking system or the marking tool ..."). Zatkovich testified that, in contrast to such requirements, the specific geographical information available with the TelDig Mobile product is associated with the locate ticket, not with the individual locate marks made and recorded by the locate technician, unless the locate technician personally added additional notes or location data to the electronic record. Trial Tr. Vol. 4B at 854:9-855:17.

Further, as Chambers explained, the TelDig One Call drawing tool uses geographic coordinates (latitude and longitude) provided on the locate ticket to pull up a map— not to record locate marks, much less to record the geographic coordinates associated with a locate mark. Trial Tr. Vol. 2A at 221:5-20; Email Re: TelDig Systems— TelDig Web Drawing Tool Integration-vl 10.doc, PX-057. Finally, both Chambers and Farr testified that the TelDig One Call drawing tool was not able to track and record specific geographic location data for each locate mark because sketches completed with such drawing tool were saved in PNG format, which has "no way to store GPS coordinates for each of the lines represented." Trial Tr. Vol. 2A at 221:21-222:10; Trial Tr. Vol. 4A at 776:7-777:4. Thus, S&N has not demonstrated that the TelDig Mobile product had the ability to track and record specific geographical location data, as required in the '359 and '001 Patents.

Third, S&N has not demonstrated that the TelDig Mobile product had the ability to create a searchable electronic record capable of recording the necessary locate operation data. The inventions detailed in claim 1 of the '359, '344, and '204 Patents each require that certain locate data be recorded in a searchable electronic manifest or a "searchable electronic record of a locate operation." '204 Patent, Col. 34:52-35:9, PX-002 (requiring the "searchable electronic record" to include a "digital representation of at least one locate mark"); '359 Patent, Col. 17:53-18:21, PX-003 (requiring the "searchable electronic record" to include a set of geographic points along a marking path, property address, timestamp, name of the locate technician, name of company responsible for performing locate operation, and ticket number); '344 Patent, Col. 17:40-18:19 (requiring the "searchable electronic record" to include an image, geographic location of

the dig area, timestamp, and digital representation of at least one physical locate mark). Evidence at trial demonstrated that the TelDig Mobile product does not possess the capability to store such locate data in a single "searchable electronic record." Instead, the evidence at trial indicates that the TelDig Mobile product, like the TelDig One Call product, saved any marked up images in PNG format, which is an image or graphics file format.[36] As Farr testified, PNG format is an image file, unable to store "individual elements within it, [or] layer artifacts within [the] image" and then retrieve such data in a search. Trial Tr. Vol. 4A at 776:7-25. Instead, "the only underlying data you can include in images like a PNG [is] information called EXIF data, which is a high level GPS location for the picture itself . . . ." As such, Chambers testified, PNG format is unable, among other things, to "store GPS coordinates for each of the lines recorded." Trial Tr. Vol. 2A at 222:2-7. Further, PNG format is unable to "measure in pixel," making it impractical to verify the geographic or locational accuracy of digitally recorded locate marks included in a PNG file. Thus, S&N has not demonstrated that the TelDig Mobile product had the ability to create a searchable electronic record meeting the limitations of claim 1 of the '359, '344, and '204 Patents.

Additionally, the fact that Teja submitted TelDig documents, and Zatkovich's expert report, to the PTO during prosecution of other e-Sketch patent applications, and such patents issued over the TelDig references and Zatkovich's report, suggests that TelDig's products are not but-for material with respect to the Patents-in-Suit.

Having reviewed such TelDig information, the examiner determined that such references did not prevent issuance of other e-Sketch Patents. Therefore, S&N has not demonstrated that the TelDig Mobile product, of which CertusView was aware from the MIR and its own interactions with TelDig, is but-for material to the Patents-in-Suit.

### b. Intent

▮▮ Finally, even if the TelDig Mobile product was but-for material to the Patents-in-Suit, S&N has not demonstrated that the " 'single most reasonable inference able to be drawn from the evidence,' " see Therasense, 649 F.3d at 1290 (quoting Star Sci., 537 F.3d at 1366), is that CertusView withheld such product during prosecution of the Patents-in-Suit with the specific intent to deceive the PTO. There is scant evidence in the record that CertusView knew that the TelDig Mobile product was material and that CertusView deliberately withheld such information from the PTO. Rather, the evidence at trial demonstrates that CertusView did not submit TelDig prior art to the PTO, or pass on TelDig information to Teja, because it believed TelDig to be inventing products in, and concerned with, a completely different portion of the locate operation field: ticket management and One Call center software.

In particular, when Chambers was questioned by the Court, as to why he did not believe that the use of TelDig's products transferred to CertusView's e-Sketch invention, he explained that he, and others at CertusView, thought TelDig products

---

**36.** Zatkovich presented the only evidence at trial disputing the TelDig Mobile product's use of PNG format. Zatkovich testified that TelDig One Call used PNG format, but TelDig Mobile did not. Trial Tr. Vol. 4B at 872:20-873:9. Zatkovich, however, did not discuss the file mechanism by which TelDig Mobile saves marked up images, and he provided no documentary support for his assertion. Additionally, Zatkovich's reliability on this point is further undercut by his failure to use, test, or investigate the TelDig Mobile product.

and e-Sketch were "totally different." Trial Tr. Vol. 2A at 288:2-8.

THE COURT: And so what was the distinction, the difference or the lack of transferability that caused you to believe [TelDig] was not something about which the Patent Office should be made known?

THE WITNESS [Chambers]: The use case is totally different. From our perspective you've got a locator in the field who is marking not only the facility marks, they're documenting all the facility marks, but they're also documenting the type of facility. Is it an electric line? Is it a gas line? So generating the APWA color codes are the standard across the country for that. None of these tools, TelDig in particular, had any way to convey color or utility type about the facilities. And that's a major part, because there's a lot of times where, if you're digging and there's a water line or a sewer line, you can probably, if you're not doing a deep hole, you can probably work on top of that. So not having the ability to capture that information, because it was for a totally different use case, we thought made it irrelevant.

THE COURT: So what was being done with the TelDig Utility Suite in its most generic and basic form was allowing somebody to indicate on a diagram or map of some sort where the dig was going to take place?

THE WITNESS [Chambers]: That's correct.

THE COURT: And what you hoped to do with e-Sketch was to place marks showing what was going on at the site with associated information?

THE WITNESS [Chambers]: That's correct. With a high level of specificity.

THE COURT: And so you felt it was different because you didn't feel that what was in the TelDig Utility Suite was a subset of what you planned to do with e-Sketch?

THE WITNESS [Chambers]: Correct.

Trial Tr. Vol. 2A at 289:2-290:8. Further belying any suggestion that CertusView possessed the specific intent to deceive the PTO, upon being asked similar questions by the Court, Dr. Dymond also explained that TelDig had created a "redlining process" which differentiated its product from what the e-Sketch inventions were designed to do. Trial Tr. Vol. 5A at 1058:2-1059:15.

THE COURT: When you say that these sketches, that editing the sketches refers to a redlining process whereby the locator may use the proposed software to edit the utility maps so that the maps more accurately reflect the actual location of the underground utilities, and here now you're suggesting that you can't—if I understand correctly, you can't use that, or it's not intended to be used for placing locate marks, the next question that comes to mind is, well, why not? Why isn't [th]is analogous? If you can't [sic] use it for redlining for utilities, why can't you use it for—why shouldn't somebody have known that you could also use it for placing locate marks? Are you saying that the specificity is different with respect to the placing of locate marks than with respect to correcting location of utilities on the map? [37]

THE WITNESS [Dr. Dymond]: I think there's two issues, if I can answer you. I think one is, yes, I don't think that the accuracy of the data and the software

---

37. The Court notes that the quoted portion of the trial transcript accurately reproduces the Court's exchange with Dr. Dymond. However, the Court misspoke on the record. Therefore, the Court has here placed a sic after "can't" because the Court should have said "can.".

are sufficient for doing two-inch paint marks. . . .

I think two, what the testimony is that we heard before in that it was a .PNG file format, meaning it's a picture format, is that we can't do lines with coordinates. I think that's No. 2. So what we can do, though, is we can redline. We can put a circle around this area on the map, we can put an approximation of the line which is basically Windows Paint, if you will. It's pixelated. We can put a little line with an arrow to it and say you've got a line here we didn't know about. So it's a redline, and it says we've got a problem here and we send it back to the City of Norfolk that says there is now a sewer line here that we didn't know about, update your maps to make them more accurate.

Trial Tr. Vol. 5A at 1060:12-1061:20.

CertusView employees received multiple demonstrations of TelDig software and confidential information, pursuant to two separate agreements with TelDig, which led them to conclude that TelDig was not relevant or material to its e-Sketch inventions. The evidence at trial indicates a similar conclusion: that TelDig's products are concerned with a different portion of the locate operation field. It is on this basis that CertusView withheld the MIR, the discussion of TelDig within the MIR, and the TelDig Mobile product from Teja and the PTO. Thus, based upon the evidence presented at trial, and discussed above, S&N has not demonstrated that Certus-View withheld TelDig information from the PTO with the specific intent to deceive the PTO.

For the reasons stated above, the Court concludes that, while some version of the TelDig Mobile product is prior art to the Patents-in-Suit, S&N has not demonstrated that such product is but-for material to the Patents-in-Suit or that such product was withheld during prosecution of the Patents-in-Suit with the specific intent to deceive the PTO. As such, S&N has not demonstrated that CertusView committed inequitable conduct related to the TelDig Mobile product.

## B. Misrepresentation of Inventorship

### 1. Farr

S&N asserts that Nielsen, Chambers, Teja, and Farr committed inequitable conduct by submitting to the PTO false Inventor Declarations for the '204 and '341 Patents naming Farr as an inventor on the '204 and '341 Patents. S&N asserts that such Inventor Declarations are false because no witness "could point with conviction to any contributions that would justify naming [Farr] as an inventor" on the '204 and '341 Patents. Defs.' Post-Trial Brief at 25. S&N further asserts that submitting such false Inventor Declarations was necessarily but-for material and such submission was done with intent to deceive the PTO. In response, CertusView argues, first, Farr is an inventor of the '204 and '341 Patents, and that S&N has failed to prove that the Inventor Declarations are false. Second, CertusView argues, even if the Inventor Declarations were false, S&N has not demonstrated that such Declarations were submitted with the specific intent to deceive the PTO regarding Farr's inventorship.[38] The Court will address each argument in turn.

For the following reasons, the Court finds that S&N has not demonstrated that Nielsen, Chambers, Teja, or Farr submitted false Inventor Declara-

---

38. CertusView does not appear to dispute that submission of a false Inventor Declaration satisfies the but-for materiality standard necessary for proof of an inequitable conduct claim. As such, the Court does not address the materiality of the Inventor Declarations for the '204 and '341 Patents.

tions for the '204 and '341 Patents. Farr is a joint inventor, with Nielsen and Chambers, of the '204 and '341 Patents because he helped conceptualize and invent two of e-Sketch's predecessor components, CertusView's electronic marking wand and Virtual WhiteLine products, and he helped conceptualize and execute the "marriage" between the Virtual WhiteLine and e-Sketch products. The electronic marking wand product is used by locate operators to capture the color of the paint sprayed on the ground during a locate operation and the precise location of such paint on the ground. As noted above, Farr is an undisputed inventor of the '001 Patent, which relates to the electronic marking wand, and the original GPS enabled marking wand patent, the '105 Patent. The Virtual WhiteLine product is used by excavators to show, with a high level of precision, the area where they intend to dig by marking up a high resolution aerial image of a ticket location. As noted above, Farr is the undisputed inventor of the '117 Patent, related to CertusView's Virtual WhiteLine technology, a priority patent claimed by both the '204 and '341 Patents.

The '204 Patent is a continuation-in-part of the '117 Patent, and the '341 Patent is a continuation-in-part of the '204 Patent. The '204 Patent borrowed figures, descriptions of those figures, and certain claims from the '117 Patent–all of which Farr helped to create–demonstrating the conceptual relationship between the '117 Patent and the '204 Patent. In particular, (1) figures 9-16 of the '204 Patent came from the '117 Patent, (2) columns 18-34 of the '204 Patent, describing the figures, were drawn from the '117 Patent, and (3) certain claims from the '117 Patent, regarding different options of possible base images, were reused in the '204 Patent. Similarly, the '341 Patent, as a continuation-in-part of the '204 Patent, included figures 9-16 from the '117 Patent, columns

18-34 from the '204 Patent, and certain claims from both the '117 and '204 Patents.

Farr also helped conceptualize and implement the "marriage" of the Virtual WhiteLine and e-Sketch inventions. Farr and others recognized the direct relationship between documentation created by an excavator in the Virtual WhiteLine product and its communication to a locator via the e-Sketch product and saw similarities between the two products and their "use[ ] cases." Trial Tr. Vol. 4A at 760:10-18. In particular, Farr contributed to the integration of the Virtual WhiteLine invention and e-Sketch by recognizing that the ability to vary the base image, on which an excavator might draw using the Virtual WhiteLine product, could be transferred to e-Sketch, allowing a locator to draw on a series of images and save such altered images as a searchable electronic record. See Trial Tr. Vol. 3A at 470:18-473:10 (explaining Teja's view of Farr's contributions to the '204 and '341 Patents). Additionally, Farr contributed to both Virtual WhiteLine and e-Sketch inventions regarding the ability to import data from the electronic marking wand. Further, the integration of the Virtual WhiteLine product and e-Sketch was largely coordinated by "Project Trinity," of which Farr was the "team lead." In November 2008, the Project Trinity team implemented e-Sketch in Lawrenceville, Georgia, rolling out the e-Sketch product for use. In December 2008, the Project Trinity team implemented e-Sketch in Marietta, Georgia, and, in February 2009, the Project Trinity team implemented e-Sketch in Forest Park, Georgia.

Finally, the evidence at trial demonstrated that Farr contributed to the specific limitations and claims of the '204 and '341 Patents. With respect to the '204 Patent, the inventive process was a "collaborative effort," and Farr's contributions

may appear in every claim of the '204 Patent. Specifically, Farr explained that he contributed the "at least one input image" limitation, which appears in each independent claim of the '204 Patent and is, therefore, a limitation on every claim in the '204 Patent. Farr also explained that he made specific inventive contributions, regarding the specific input images, to claims 6, 7, 8, 10, 12, and 14 of the '204 Patent:

> In claim 8, my contribution is to the different types of maps generally, but a topographical map in specific, which stemmed from our work that we had done with Virtual WhiteLine and with another product of mine called the OmniLoom which dealt with facility records. We saw a need to have different types of maps, and so I individually contributed the topographical map to claim 8.
>
> In claim 10, the facility map came directly from that work with a product called OmniLoom which dealt with facility records where we saw a benefit in adding sketching on top of the facility records themselves as a point of reference. So I contributed to claim 10.
>
> In claim 12, where you see the at least one input image that I mentioned earlier, I contributed to the architectural construction and engineering drawings that stemmed from work with Virtual WhiteLine where we worked with excavators who worked off of those types of maps, and so I have individual contribution there.
>
> And in claim 14, I have individual contribution in creating a grid system where you don't have a base map yet the grid system can have a foundation to the world, to the real world location by having a geographic representation of that grid. . . .
>
> [I]n claim 6 it says, "The method of claim 1 wherein the at least one input image comprised of a scan or converted manual freehand sketch of the geographic area." I contributed to the at least one input as I had mentioned across other claims, as well as I had collaborative contribution to the converted manual freehand sketch.
>
> And in claim 7 it's carrying from claim 1, says, "One map of the geographic area, which is generally the map of the area." I had collaborative contribution to that, as well.

Trial Tr. Vol. 3B at 675:14-677:11.

With respect to the '341 Patent, which is a continuation-in-part of the '204 Patent, Farr explained that he specifically contributed the "at least one digital image" limitation, which is included in all of the claims of the '341 Patent and is, therefore, a contribution to each claim of the '341 Patent. Farr explained that he also made specific inventive contributions to claims 8, 13, and 21 of the '341 Patent, related to his work with the electronic marking wand. Regarding claim 8, Farr contributed to "using the location identification unit which includes that alternative location capability, the triangulation . . . to select at least one digital image for display." Trial Tr. Vol 4A at 767:16-21. Regarding claim 13, Farr explained that his contribution was based on his work developing the electronic marking wand, the "GPS-enabled marking device" mentioned in claim 13. Trial Tr. Vol. 4A at 767:22-768:6. Finally, claim 21 is the apparatus designed to perform the inventive method discussed in claim 8. Regarding claim 21, Farr contributed to using the "location identification unit," discussed in claim 8, and to the apparatus used to select the one digital image specifically discussed in claim 21. Trial Tr. Vol 4A at 768:7-13.

Thus, considering Farr's work with the electronic marking wand and Virtual WhiteLine products, his inventorship of the '117 Patent, Farr's work conceptualizing and integrating the Virtual WhiteLine and e-Sketch products, and Farr's specific contributions to the '204 and '341 Patents,

the Inventor Declarations for the '204 and '341 Patents did not falsely name Farr as an inventor. Farr made a sufficiently significant contribution to the '204 and '341 Patents. Further, Farr's contributions were significant when measured against the dimensions of the full invention, and such contributions improved on and added to well-known concepts and the current state of the art.

S&N argues that the Court should not credit Farr's testimony regarding his contributions to the '204 and '341 Patents because Farr's testimony was contradictory and, at times, incomplete. Defs.' Post-Trial Br. at 25-26. While Farr appeared confused and uncertain at times during trial, ultimately the Court found his testimony, uncontradicted by any other witness, regarding his contributions to the '204 and '341 Patents to be consistent and sufficiently credible. Additionally, the Court notes, the apparent miscommunication between CertusView's counsel and Farr regarding Farr's inventive contributions to the '204 and '341 Patents, rather than an intent to mislead the Court, appears to be the cause of Farr's initial confusing testimony regarding the specific claims to which he contributed.

■ Second, even if Farr was misnamed as an inventor on the '204 and '341 Patents, S&N has not demonstrated that misnaming Farr as an inventor was done with the specific intent to deceive the PTO. The evidence at trial demonstrated that CertusView, through Nielsen, Chambers, Crawford, and Teja, had a process for determining inventorship for the Patents-in-Suit, including tracking idea submissions and software development and a claim-by-claim determination of who should be named as an inventor on a patent. Trial Tr. Vol. 3A at 459:16-460:22; Trial Tr. Vol. 610:17-611:6. CertusView was also advised by patent counsel regarding inventorship, and the Inventorship Declarations reflect the advice of counsel. Further, it does not appear that Farr, or CertusView, had a motive for deceiving the PTO because Farr did not financially benefit from being named as an inventor of the '204 and '341 Patents.

S&N argues that misnaming Farr as an inventor of the '204 and '341 Patents is analogous to the case of Advanced Magnetic Closures, Inc. v. Rome Fastener Corp., 607 F.3d 817 (Fed.Cir.2010), in which the Federal Circuit held that a patent applicant committed inequitable conduct when he falsely claimed that he invented a device. As the Advanced Magnetic Closures case predates the Therasense decision, and, thus, relies on a lower standard for evaluating materiality and intent, the opinion is of limited applicability in the instant case, which leads the Court to disagree with S&N's assessment. See id. at 829–30 (describing the pre-Therasense materiality and intent standards). Following the Therasense decision, it is unclear whether the applicant's conduct in Advanced Magnetic Closures would satisfy the heightened standard for materiality and intent necessary to prove a claim of inequitable conduct.

Further, even if the Advanced Magnetic Closures decision were applicable, the applicant's actions in that case are distinguishable from the present facts. For example, the Federal Circuit affirmed the district court's determination that the applicant, the only inventor named in the patent, evidenced deceptive intent because (1) Mr. Bauer was either 'unable or unwilling to articulate [his] claimed invention' during his deposition, directing opposing counsel to read the patent; (2) [ ] Mr. Bauer offered difficult-to-follow explanations of the magnetic strength experiments he performed when he claimed to have conceived of the invention; (3) [ ] Mr. Bauer submitted multi-

ple sketches of his invention that he was forced to later admit were 'reconstructed' after [the defendant] challenged their authenticity; (4) [ ] Mr. Bauer could not offer any 'scientific or technical explanation' of his own patent, even though the 'only allegedly patentable' claim is based on scientific principles of magnetism; and (5) [ ] Mr. Bauer offered an evasive, argumentative, and at times contradictory testimony on his status as inventor.

Id. at 830 (quoting Advanced Magnetic Closures, Inc. v. Rome Fastener Corp., No. 98cv7766, 2008 WL 2787981, *7–9 (S.D.N.Y. July 17, 2008) (unpublished)). By contrast, Farr ultimately explained, and demonstrated, his contributions to CertusView's electronic marking wand, Virtual WhiteLine, and e-Sketch technologies and the relationship between such technologies and the patents claiming such inventions, including the Patents-in-Suit. Further, the Court notes that Farr's inventorship was not at issue at the time of his deposition in August 2014, as S&N had not yet alleged that Farr was improperly named as an inventor of the '204 and '341 Patents. Thus, the Court does not credit Farr's inability to list specific claims to which he contributed during his deposition as an inability or unwillingness "to articulate [his] claimed invention." See Trial Tr. Vol 3B at 667:17-668:8 (detailing Farr's explanation as to the difference between his deposition testimony and his trial testimony).

The Court finds that S&N has not demonstrated that CertusView submitted false Inventor Declarations for the '204 and '341 Patents. Further, S&N has not demonstrated that, even if CertusView had submitted false Inventor Declarations, such Declarations were submitted with the specific intent to deceive the PTO. Therefore, S&N has not demonstrated that CertusView committed inequitable conduct regarding Farr's inventorship of the '204 and '341 Patents.[39]

### 2. Block

S&N asserts that Nielsen, Chambers, Teja, and Farr committed inequitable conduct by submitting to the PTO false Inventor Declarations for the '359, '344, '204, and '341 Patents, omitting Block as an inventor of such patents. S&N asserts that Block was an inventor of the '359, '344,- '204, and '341 Patents because he wrote the majority of the source code for the software product known as e-Sketch, including key features of the e-Sketch invention. Defs.' Post-Trial Brief at 24. S&N further asserts that submitting such false Inventor Declarations was necessarily but-for material and such submission was done with intent to deceive the PTO. In response, CertusView argues, first, that S&N failed to prove that Block was an inventor of the '359, '344, '204, and '341 Patents and that the Inventor Declarations submitted with the '359, '344, '204, and '341 Patents were false. Second, CertusView argues, even if the Inventor Declarations were false, S&N has not demonstrated that such Declarations were submitted with the specific intent to deceive the PTO regarding Block's inventorship.[40]

---

**39.** CertusView further asserts that, even if inventorship was incorrect, the proper remedy is correction of such error pursuant to 35 U.S.C. § 256–not a finding of inequitable conduct. However, as the Court has determined that Farr was not incorrectly named as an inventor of the '204 and '341 Patents, the Court need not address CertusView's argument on this point.

**40.** As discussed above, CertusView does not appear to dispute that submission of a false Inventor Declaration satisfies the but-for materiality standard, and the Court does not address the materiality of the Inventor Declarations for the '359, '344, '204, and '341 Patents.

■ First, the Court finds that S&N has not demonstrated that Nielsen, Chambers, Teja, or Farr submitted false Inventor Declarations for the '359, '344, '204, and '341 Patents, omitting Block as an inventor. S&N has not demonstrated that Block is an inventor of the '359, '344, '204, and '341 Patents. While Block developed portions of e-Sketch software, such development does not, in this matter, constitute conception or invention. Instead, the evidence at trial demonstrates that conception of the e-Sketch invention took place before Block began work at Dycom and CertusView.

As noted above, conception of the e-Sketch product began in 2006, during the work of Nielsen and Chambers on the Virtual Locator 2007 program. The Virtual Locator 2007 project participants met for the first time, and Nielsen and Chambers presented their research to the group, in October 2006. During that meeting, Chambers recorded ideas related to the original e-Sketch inventions by taking notes of the proceedings and photographing a whiteboard session. As Chambers described at trial, the notes and records of that October 2006 meeting correspond to the elements of claim 1 of the '359 and '344 Patents and describe the concept of a "searchable electronic manifest." Conception of the e-Sketch invention continued through a series of meetings regarding the Virtual Locator 2007 project, discussions with an attorney regarding patenting the electronic marking wand and e-Sketch inventions, and testing of the e-Sketch concept through pilot programs in Florida and Maryland. Nielsen and Chambers explained that they completed conception of the e-Sketch product in April 2007, when they discovered a means by which they could display paint on the ground with specificity and accuracy using a Garmin running watch and Google Earth map.

Block began work as a contract employee with Dycom and CertusView in September 2007, almost a year after conception of the e-Sketch invention began. S&N presented no evidence that Block added to, or modified, the concepts detailed by Nielsen and Chambers between October 2006 and April 2007. Instead, Block was asked, by Chambers and Nielsen, to implement the e-Sketch product during his employment. In particular, Chambers prepared a set of requirements and specifications for implementation of the e-Sketch invention, see Dycom Industries, Inc. System Requirements Specification for Locating eSketch, DX-041, and Block followed those requirements. During the beginning of his work with Dycom, Block explained that he had to overcome his lack of familiarity with the locate industry in order to perform the tasks assigned to him. Block Depo. Tr. at 48:25-49:16. Block further explained that the concepts of an electronic manifest, incorporating a satellite image into the manifest, and drawing on such an image in the field, were presented to him by Nielsen. Block Depo. Tr. at 46:12-48:2, 107:17-109:19. Finally, Block does not claim to be an inventor on any of the Patents-in-Suit, and no witness presented testimony that Block was an inventor on any claim of the '359, '344, '204, or '341 Patents. Block, however, did provide inventive contributions on other CertusView e-Sketch patents and he is named as an inventor on such patents, namely the '980 Patent which claims inventions related to revision layers.

Second, the Court finds that even if Block should have been named as an inventor of the '359, '344, '204, or '341 Patents, S&N has not demonstrated that Block was omitted as an inventor with the specific intent of deceiving the PTO. S&N has provided no evidence that CertusView intentionally omitted Block as an inventor. To the contrary, as explained above, CertusView and Teja had a well-established

process for accurately determining and representing patent inventorship. Additionally, CertusView did not have a motive to misrepresent Block's inventorship in this matter. Neither Block nor CertusView benefitted from omitting Block as an inventor, and Block, when he was later named as an inventor in other patents, did not receive any financial benefit from his status as an inventor.

Therefore, S&N has not demonstrated that CertusView submitted false Inventor Declarations for the '359, '344, '204, or '341 Patents. Further, S&N has not demonstrated that, even if CertusView had submitted false Inventor Declarations, such Declarations were submitted with the specific intent to deceive the PTO. As such, S&N has not demonstrated that CertusView committed inequitable conduct regarding Block's inventorship of the '359,- '344, '204, or '341 Patents.[41]

### C. Material Misrepresentation of Prior Art

Finally, S&N asserts that Nielsen, Chambers, and Teja made material misrepresentations to the PTO concerning the Sawyer and Tucker references during prosecution of the '344 Patent. Specifically, S&N argues that Teja made a material factual misrepresentation to the PTO in the February 13, 2012 Amendment and Reply by stating that the concepts of a "locate operation" and "locate ticket" were "completely absent from the cited prior art references." In response, CertusView raises three defenses. First, CertusView argues that S&N failed to prove its inequitable conduct allegations on this issue because "Teja's argument[s] that the amended claims were patentable over the teachings of Tucker and Sawyer were not

misrepresentations of fact, but rather good-faith arguments for patentability distinguishing the amended claims over the teaching of the prior art." CertusView's Post-Trial Br., 107, ECF No. 516. Second, CertusView argues that S&N has not demonstrated that the alleged misstatements regarding Tucker and Sawyer were but-for material. Finally, CertusView argues that S&N has not demonstrated that such statements were made with the specific intent to deceive the PTO. The Court will address each of CertusView's three defenses in turn.

First, the Court finds that S&N has not demonstrated that Teja's statements in the February 13, 2012 Amendment and Reply are factual misrepresentations. Instead, Teja's statements, that the concepts of a "locate operation" and "locate ticket" are "completely absent from the cited prior art references," are a reasonable, albeit somewhat inartful, attempt to distinguish the teachings of Tucker and Sawyer from the claims of the '344 Patent. As explained above, "[t]here is nothing wrong with advocating, in good faith, a reasonable interpretation of the teachings of the prior art." Apotex Inc., 763 F.3d at 1361–62 (citing Rothman, 556 F.3d at 1328–29). Teja's statements, particularly in light of the examiner interview conducted by Nielsen and Teja on December 6, 2011, discussing the same information presented in the February 13, 2012 Amendment and Reply, are examples of "attorney argument." Teja is "free to present [such] argument[s] in favor of patentability without fear of committing inequitable conduct." Rothman, 556 F.3d at 1329 (citing Young, 492 F.3d at 1348).

---

41. CertusView also asserts that, even if inventorship was incorrect, the proper remedy is correction of such error pursuant to 35 U.S.C. § 256—not a finding of inequitable conduct. However, as the Court has determined that Block was not incorrectly omitted as an inventor of the '359, '344, '204, or '341 Patents, the Court need not address CertusView's argument on this point.

Second, the Court finds that even if Teja's statements were misrepresentations, S&N has not demonstrated that such statements were but-for material to the issuance of the '344 Patent. Instead, the Examiner's Notice of Allowability for the '344 Patent indicates that the '344 Patent issued for reasons distinct from the alleged misrepresentations. Specifically, the Notice of Allowability stated that none of the prior art taught (1) the conventional locate operation; and (2) "at least one digital representation of at least one physical locate mark applied to the ground" by the locate technician during the locate operation, and the communication interface to "electronically transmit and/or electronically store the searchable electronic record of the locate operation so that performance of the locate operation is verifiable." '344 Patent File History, 29, PX-234. The Notice of Allowability demonstrates that it is the '344 Patent's additions to the prior art locate operation that caused the '344 Patent to be allowed. Further, the Examiner had access to, and considered, a full record of prior art, including the Tucker, Sawyer, and Evans references, which repeatedly discussed conventional prior art locate operations. The patent prosecution file indicates that Examiner Bitar thoroughly reviewed the Tucker and Sawyer references and relied on such references, in addition to others, to issue two separate rejections of the claims in the '344 Patent. As such, the Examiner was capable of determining whether the concepts of "locate operation" or "locate ticket" were "completely absent" from the prior art and according the alleged misstatements their proper weight. See WesternGeco L.L.C. v. ION Geophysical Corp., No. 4:09cv1827, 2012 WL 567430, at *20 (S.D.Tex. Feb. 21, 2012) (explaining that "[t]he Examiner's independent reliance on the prior art in this case makes clear that any alleged misrepresentation by Roebuck cannot have been the but-for cause of the patent's issuance").

Third, the Court finds that even if Teja's statements were material misrepresentations, S&N has not demonstrated that such statements were made with the specific intent to deceive the PTO. As noted above, "[t]o meet the clear and convincing evidence standard, the specific intent to deceive must be 'the single most reasonable inference able to be drawn from the evidence.' " Therasense, 649 F.3d at 1290 (quoting Star Sci., 537 F.3d at 1366). S&N has not demonstrated that the single most reasonable inference to be drawn in this matter is that Teja made the alleged misstatements to mislead and deceive the PTO. Instead, the Court finds it to be more likely that Teja made the alleged misstatements for the purpose of making a reasonable attorney argument, distinguishing the Tucker and Sawyer references from the claims of the '344 Patent.

Therefore, the Court finds that Teja's statements regarding the Tucker and Sawyer references in the February 13, 2012 Amendment and Reply during prosecution of the '344 Patent, are not misrepresentations, but are attorney argument, advocating a "reasonable interpretation of the teachings of the prior art." Apotex Inc., 763 F.3d at 1361–62 (citing Rothman, 556 F.3d at 1328–29). Further, such statements are not but-for material to the issuance of the '344 Patent and they were not made with the specific intent to deceive the PTO. As such, S&N has not demonstrated that CertusView committed inequitable conduct related to Teja's statements regarding Tucker and Sawyer.

## VIII. CONCLUSION

For the reasons discussed above, Plaintiff/Counter-Defendant's Rule 52(c) Motion is **DENIED,** and Plaintiff/Counter-Defendant's remaining Motion in Limine, ECF No. 436, is **DENIED.** Further, Plaintiff/Counter-Defendant's Motion to En-

force the Court's Memorandum Order, ECF No. 494, is **GRANTED** and Plaintiff/Counter-Defendant's Objections to Defendants/Counter-Plaintiffs' Post-Trial Brief, ECF No. 529, are **OVERRULED.**

With respect to Defendants/Counter-Plaintiffs' declaratory judgment counterclaim for inequitable conduct, asserted in its Second Amended Answer and Counterclaim, ECF No. 336, for the reasons discussed above, such counterclaim is **DENIED** on each of the five grounds alleged. It is therefore **ORDERED** that judgment be entered in favor of Plaintiff/Counter-Defendant as to Defendants/Counter-Plaintiffs' declaratory judgment counterclaim for inequitable conduct.

The Clerk is **REQUESTED** to send a copy of this Opinion and Order to all counsel of record.

**IT IS SO ORDERED.**